Charles Margett, J.
This is an action to recover damages for libel arising out of the publication in the July 8, 1965 edition of the New York Herald Tribune of a news article captioned “Company Faces a $4 Million Payment for Color Cameras: Crucial Period Looms Ahead for Fotochrome ”. Defendant New York Herald Tribune, Inc., moves for summary judgment.
The corporate plaintiff, a publicly held corporation whose stock is actively traded on the American Stock Exchange, is one of the largest independent film processors in the United States. The company, as well as its president and board chairman, the individual plaintiffs, enjoy not only a national but an international reputation. In August, 1964 it was rumored that Fotochrome had acquired the rights to a low-priced camera that was capable of producing low-cost color photographs without the use of negatives. On this information, Fotochrome stock rose from $2.25 per share to $17.25 per share in 28 trading days. Noting that the “public interest” in Fotochrome was “ the greatest the Exchange had witnessed in many months ’ ’, the American'Stock Exchange put the stock under “close scrutiny On October 9, 1964 the Securities and Exchange Commission suspended trading in the stock for a total of 20 days. Thereafter, rumors concerning the cameras slackened until May, 1965, when they were revived, as was the heavy trading in the company’s stock. It was against this background that the article was written.
- Plaintiffs allege that by the article which “ purported to be an expose of the dire financial straits concerning the plaintiff, fotochrome, inc., and alleged manipulation of assets of said plaintiff and its stock by the plaintiffs, nadaline and knopf,” defendants ‘ ‘ meant and intended to mean and was understood to mean by the persons reading the said article that the plaintiffs were in dire financial straits, had to meet a payment of Four Million Dollars ($4,000,000.00) while faltering under a deficit of Two Million Dollars ($2,000,000.00) and a debt of $589,904.00; was defendant in a number of damage suits, including a claim for back pay to its employees of $250,000.00 and in spite of these obligations, fotochrome, inc., had completed two acquisitions that decreased the book value of its stock”. It is further alleged that the article was “ highly colored, misleading, distorted and contained false facts and omissions of fact ” *228 and that it had the result of .severely depressing the price of Fotochrome stock.
The initial question presented is whether, under the circumstances of the instant case, the doctrines of New York Times Co. v. Sullivan (376 U. S. 254), Time, Inc. v. Hill (385 U. S. 374) and Curtis Pub. Co. v. Butts (388 U. S. 130) are applicable, since, under ordinary rules of qualified privilege based upon fair comment, the standard against which liability is measured is substantially different. (See Foley v. Press Pub. Co., 226 App. Div. 535.) In 1964, the Supreme Court of the United States, in the New York Times case, stated (p. 279): “A rule compelling the critic of official conduct to guarantee the truth of all his factual assertions — and to do so on pain of libel judgments virtually unlimited in amount — leads to a comparable ‘ self-censorship. ’ Allowance of the defense of truth, with the burden of proving it on the defendant, does not mean that only false speech will be deterred. Even courts accepting this defense as an adequate safeguard have recognized the difficulties of adducing legal proofs that the alleged libel was true in all its factual particulars. See, e. g., Post Publishing Co. v. Hallam, 59 F. 530, 540 (C. A. 6th Cir. 1893); see also Noel, Defamation of Public Officers and Candidates, 49 Col. L. Rev. 875, 892 (1949). Under such a rule, would-be critics of official conduct may be deterred from voicing their criticism, even though it is believed to be true and even though it is in fact true, because of doubt whether it can be proved in court or fear of the expense of having to do so. They tend to make only statements which 1 steer far wider of the unlawful zone. ’ Speiser v. Randall, supra, 357 U. S., at 526. The rule thus dampens the vigor and limits the variety of public debate. It is inconsistent with the First and Fourteenth Amendments.”
Thus, there was created a rule based on constitutional guarantees which prohibited a public official from recovering damages for a defamatory falsehood relating to his official conduct unless there was proof of actual malice — ‘ ‘ that is, with knowledge that it was false or with reckless disregard of whether it was false or not.” (New York Times Co. v. Sullivan, supra, p. 280.)
In 1967 the United States Supreme Court decided Time, Inc. v. Hill (385 U. S. 374), an action brought under sections 50 and 51 of the New York Civil Rights Law, the so-called “ right of privacy” statute. The court stated (pp. 387-388):
“ We hold that the constitutional protections for speech and press preclude the application of the New York statute to redress false reports of matters of public interest in the absence *229 of proof that the defendant published the report with knowledge of its falsity or in reckless disregard of the truth.
“ The guarantees for speech and press are not the preserve of political expression or comment upon public affairs, essential as those are to healthy government. One need only pick up any newspaper or magazine to comprehend the vast range of published matter which exposes persons to public view, both private citizens and public officials. Exposure of the self to others in varying degrees is a concomitant of life in a civilized community. The risk of this exposure is an essential incident of life in a society which places a primary value on freedom of speech and of press. ‘ Freedom of discussion, if it would fulfill its historic function in this nation, must embrace all issues about which information is needed or appropriate to enable the members of society to cope with the exigencies of their period.’ Thornhill v. Alabama, 310 U. S. 88, 102.”
To complete the trilogy of cases, the United States Supreme Court, in Curtis Pub. Co. v. Butts (388 U. S. 130-155), held that: “ a ‘ public figure ’ who is not a public official may also recover damages for a defamatory falsehood whose substance makes substantial danger to reputation apparent, on a showing of highly unreasonable conduct constituting an extreme departure from the standards of investigation and reporting ordinarily adhered to by responsible publishers. ’ ’ The court further stated “nothing in this opinion is meant to affect the holdings in. New York Times and its progeny, including our recent decision in Time, Inc. v. Hill ” and in a footnote “ nor does anything we have said touch, in any way, libel or other tort actions not involving public figures or matters of public interest.”
While it is difficult to define the outer limits of this constitutionally created privilege, application of the rule has been made to the athletic director of a State University (Curtis Pub. Co. v. Butts, supra), a retired Army general (Associated Press v. Walker, 388 U. S. 130), mail order medical testing laboratories (United Med. Labs. v. Columbia Broadcasting System, 404 F. 2d 706), a professional gambler who injected himself into an election campaign in a small foreign country (Time, Inc. v. McLaney, 406 F. 2d 565), a well-known hotel which accommodates hundreds of visitors to the Masters Golf Tournament (Bon Air Hotel v. Time, Inc., 295 F. Supp. 704), the owner and publisher of a high school basketball scouting report (Garfinkel v. Twenty-first Century Pub. Co., 30 A D 2d 787, app. dsmd. 22 N Y 2d 970), and a retail health food and special diet food store and restaurant (All Diet Food Distrs. v. Time, Inc., 56 Misc 2d 821).
*230 It is the opinion of this court that the New York Times-Hill-Butts rule should also he applied to the instant plaintiffs. The stock market, once the domain of the rich or the institutional purchaser, now attracts investors of all economic stations. There is no less interest in, nor less of a. need for information concerning, the stock market in general or the successes, failures or manipulations of specific corporations in which thousands of people have invested their personal fortunes, than their is in basketball, football, crime or public health.
Having made this determination, the court turns its attention to the merits of the instant motion. Plaintiffs, upon this motion, are required to show sufficient probative evidence to give rise to a triable factual issue as to whether actual malice existed. The test of malice has been further refined by the United States Supreme Court in St. Amant v. Thompson (390 U. S. 727, 730-731) in which the court stated: ‘‘ ‘ Reckless disregard,’ it is true, cannot be fully encompassed in one infallible definition. Inevitably its outer limits will be marked out through case-by-case adjudication, as is true with so many legal standards for judging concrete cases, whether the standard is provided by the Constitution, statutes, or case law. Our cases, however, have furnished meaningful guidance for the further definition of a reckless publication. In New York Times, supra, the plaintiff did not satisfy his burden because the record failed to show that the publisher was aware of the likelihood that he was circulating false information. In Garrison v. Louisiana, 379 U. S. 64 (1964), also decided before the decision of the Louisiana Supreme Court in this case, the opinion emphasized the necessity for a showing that a false publication was made with a ‘ high degree of awareness of * * * probable falsity. ’ 379 U. S., at 74. Mr. Justice Harlan’s opinion in Curtis Publishing Co. v. Butts, 388 U. S. 130, 153 (1967), stated that evidence of either deliberate falsification or reckless publication ‘ despite the publisher’s awareness of probable falsity ’ was essential to recovery by public officials in defamation actions. These cases are clear that reckless conduct is not measured by whether a reasonably prudent man would have published, or would have investigated before publishing. There must be sufficient evidence to permit the conclusion that the defendant in fact entertained serious doubts as to the truth of his publication. Publishing with such doubts shows reckless disregard for truth or falsity and demonstrates actual malice. ’ ’
While plaintiffs have succeeded in pointing out certain inaccuracies, they have failed to show that defendant knew *231 that the information it was publishing was false or that the article was published despite the publisher’s awareness' of its probable falsity. Investigatory failures alone are insufficient to satisfy the standard. (New York Times Co. v. Sullivan, supra.) The affidavit of one of the corporate plaintiff’s stockholders in which he states that at an impromptu meeting following the June 7, 1965 stockholders ’ meeting the reporter stated to a friend, in response to his statement that he and his group had a large short position in Fotochrome stock, “ I will easily take care of that in my paper ” is not in and of itself sufficient to defeat defendant’s motion for summary judgment. Moreover, no showing has been made of highly unreasonable conduct constituting “ an extreme departure from, the standards of investigation and reporting ordinarily adhered to by responsible publishers ”. The reporter under whose by-line the news article complained of appeared had been a researcher with Business International Publications and had been a reporter for various business publications prior to her employment by the corporate defendant. The source material used in preparing the article were past news clippings concerning the plaintiffs (see Schneph v. New York Post Corp., 16 N Y 2d 1011), annual reports and proxy statements of Fotochrome, and American Stock Exchange releases as well as Securities and Exchange Commission reports.
Accordingly, the motion for summary judgment dismissing the complaint is granted.