Thomas R. Jones, J.
This is a motion for a directed verdict after the close of all the evidence in a trial of an action for libel. The motion is granted. The complaint is dismissed. This court finds that no contrary verdict could be reached by any rational interpretation of the evidence in the case. (CPLR 4401; Blum v. Fresh Grown Preserve Corp., 292 N. Y. 241, 245; Wessel v. Krop, 30 A D 2d 764, 765.)
The plaintiff, Hyman Cohen, was employed as a bartender at the Vivere Lounge on New York’s Second Avenue on July 11, 1963. At 11:30 p.m. he became a witness to the slaying of Robert Hunos in the kitchen of his bar by two gangsters, Frank Falco and Anthony Casserino. The defendant, Jimmy Breslin, a well-known newspaper columnist, wrote a satirical article about Hyman Cohen and the part he played as a witness to the murder in the Vivere Lounge. The Breslin article, entitled “ A Change of Heart,” was published in the August 4, 1963 edition of the New York Herald Tribune, a codefendant in the action. The article read as follows:
“ Among New Yorkers out of town for the week end, and out of town for a lot of week ends to come if he has his way, is Hr. Hyman Cohen, of the Bronx. His friends say that he went to the Catskills for the rest of the summer, but there is a feeling that the Catskills are not quite far enough away for Hy at present.
“ ‘ The last time I saw Hy he asked me about the Italian Alps,’ a detective was saying the other night.
“ Hy is a man who once liked this city very much. Particularly, he liked the part of the city they make television shows about. Gunmen, action guys; they were Hy’s idea of people. Then a couple of weeks ago, this little corner of life in our town grew too big for Hy to handle. He had a change *89 of heart. A heart ‘ attack ’ might be a better word for it. And he left town thoroughly disillusioned.
‘ ‘ Hy is a bartender, and it all started a couple of .summers ago when he worked at a hotel in the Catskills and found himself pouring drinks for some underworld notables. He never really got over this. When the summer ended, Hy came back to New York and he was no longer Hy Cohen of the Bronx. He was Hy Cohen of the Rackets. He wore a big, snap-brim extortionist’s hat, white on white shirts and a white tie. And when he would talk, especially if there were only a few people at the bar and they all could listen, Hy would begin talking about all the tough guys he knew. This was Hy’s field.
CONVERSATION
“ Some bartenders talk about baseball, or girls. Others, the ones in smart joints, get a smug look when somebody mentions a Judy Garland. They could tell you all about Judy Garland. Hy? He would lean over and tell you that, huh, don’t worry about who he knows. Some of Joey G.’s boys will be around later. And what about Tony Bender? You could forget him, Hy would say. He would shrug. That was supposed to tell it all.
‘ ‘ ‘ Sometimes, Hy thought he was Lucky Luciano, ’ they were saying the other night.
“ Then on July 11, everything changed. Hy was on duty in a place called the Vivere Lounge, which is on 2d Ave. between 11th and 12th Sts. At about 11:30 at night, the Vivere had a small spot of trouble. It was supposed to be Hy’s kind of trouble, too.
“ There were about 20 people in the place. One of them, a big kid named Robert Hunos, was drinking with a friend. Then Hunos had visitors. The visitors were Anthony Casserino and Frank Falco. They were loan sharks and Hunos owed them. An argument started over the money, and Falco whipped out a gun and marched Hunos and his friend past the bar, through the back room and into the kitchen.
“ This bit of action unnerved Hy a little. He picked up a rag and began to polish a spot on the bar. He began to polish it very hard.
“ Then there was a scuffle in the kitchen. Falco belted Hunos ’ friend over the head with his gun. Then he shot Hunos twice in the head. Falco and Casserino ran out of the kitchen, and went out onto the street. They pulled their car right in front of the bar and then came back in.
*90 “ ‘ Everybody get on the floor,’ they said.
“ Hy still was polishing the spot on the bar. He was polishing that spot so hard now that his knncldes were white.
“ ‘ On the floor,’ Falco yelled at Hy. Hy kept polishing.
‘ ‘ Falco leaned across the bar and thumped a finger into Hy Cohen’s chest.
“ [1] G-et down and forget what you seen or I’m going to put four right here,’ he snapped.
“Now Hy Cohen stopped polishing. He went down to the floor. He went down in a beautiful, one-piece fall.
POUSHIiTG
“ The two loan sharks then carried Hunos ’ body out of the place, threw it into the car, then drove to the East River, where they dumped the body into the water.
[1] ‘ While they were gone, Hy Cohen got up. His hand reached out and he started polishing the bar again.
‘ ‘ He was still polishing 10 minutes later, when Falco and Casserino pulled up in front of the bar again and Falco leaned out of the car window and pegged a shot at the place. It was a warning for everybody to remain quiet over the murder. The shot ripped through the front awning and hit a ventilator fan which is above the entrance to the bar. When the bullet hit the fan it made a noise that sounded like a bomb.
“ ‘I’m shot! ’ Hy moaned.
“When the police got on the case, they grabbed everybody in sight, and Hy wound up in the Tombs as part of a homicide investigation. He stayed one night, then was released. When Hy hit the pavement in front of the Tombs that morning, he no longer was Hy of the Rackets. He was Hy from the Bronx again, and this time he was going to stay that way.
“ He held both arms up to the sky and he said, ‘ I’m through. That does it. You could forget about me.’
‘ ‘ It was the last anybody has seen of him. The other night, the Yivere was, happily, back to normal. The bar had a good crowd and people were dancing in the back room. Nothing ever had gone wrong in the place before the shooting, and probably nothing ever will happen in there again. It is just a good bar that got unlucky one night in July.
‘ ‘ But it is going to have to go without Hy from now on.
‘ I called him, ’ this fellow Albie, who owns it, was saying the other night. ‘ But he never answered. Somebody went up to his house and they banged on the door and there was no answer, either. I hear he went up to the mountains. ’
*91 “ ‘ He was going to get a job as a cook in a summer camp.’ ”
The plaintiff contends that this article about him is libelous per se in that it was false and brought him into disrepute among his friends and among his customers in the bartending business. He seeks general damages of $100,000 and exemplary damages of $500,000. The defendants admit the publication of the Breslin piece but deny malice or libel to the plaintiff. They affirmatively plead and have offered proof to show that the article is true in all material respects; that the article represents a “fair and true report of a judicial and official proceedings,” and is therefore privileged. Finally, the defendants contend that the New York Times rule in libel cases is applicable and that the constitutional guarantees of the First Amendment — speech and press — protect the article, as a discussion of a public issue. (New York Times v. Sullivan, 376 U. S. 254; Curtis Pub. Co. v. Butts, 388 U. S. 130; Gilberg v. Goffi, 21 AD 2d 517, affd. 15 N Y 2d 1023; Time, Inc. v. Mill, 385 U. S. 374; and Time, Inc. v. McLaney, 406 F. 2d 565, cert. den. 395 U. S. 922.) The last defense, i.e., the “Times” rule, is conclusive of the issues involved and will be considered forthwith.
Hnder the Times rule, if a matter of public interest is found to be involved, the court must make a determination, in the first instance, on the issue of actual malice as a constitutional question.[1], [2] (Wasserman v. Time, Inc., 424 F. 2d 920). If the court finds that a public issue is involved, the plaintiff cannot recover unless he proves with “convincing clarity” that *92 the statements were false and were published by the defendants with ‘ ‘ knowledge ’ ’ of their falsity or ‘1 reckless disregard ’ ’ of whether they were true or false [New York Times v. Sullivan, supra, pp. 279-280; see, also, Pickering v. Board of Educ., 391 U. S. 563, 573) or with a “high degree of awareness of their probable falsity” (Garrison v. Louisiana, 379 U. S. 64, 74) or that the defendants “in fact entertained serious doubts as to the truth of [their] publication” (St. Amant v. Thompson, 390 U. S. 727, 731). To this end an examination of the facts proven, or admitted by the plaintiff as true, is in order.
THE MURDER 1ST THE VIVERE LOUHGE
In the late evening of July 11, 1963 Robert Hunos was shot and killed by two gangsters, Frank Falco and Anthony Casserino, in the Vivere Lounge, a bar on Second Avenue in New York City. Hunos’ companion, James Wargas, was pistol-whipped by the killers. The slayers ‘[1] executed ’ ’ Hunos in the kitchen of the bar with a bullet through his head and smashed Wargas’ face with a gun. They dragged Hunos’ body out of the bar, tossed it into Wargas’ car and dumped it into the waters of the East River. The police found the corpse floating in the river on the following day. Hyman Cohen was an eyewitness to the murder of Hunos, as were bar owner Albie Trapeo, a barmaid, Linda Santini, and a score of patrons who were in the bar at the time. The owner of the Vivere Lounge, Trapeo and his barmaid, Santini, were drafted by the killer, Falco, to help him drag the dead body out of the establishment and into the street. The plaintiff Cohen stood watch at the door.
On July 11, 1963 Cohen reported for work, as usual, to begin the night tour as a bartender in the Vivere Lounge. His boss, Albie Trapeo, and his coworker, Linda Santini, were also on duty that night. Cohen arrived about 8 :15 p.m. and found Linda Santini behind the bar serving the customers. He therefore relaxed with his boss, Albie Trapeo, over drinks on the customer side of the bar. During the interval between 8:15 and 11:30 p.m. Cohen imbibed a dozen or more drinks with customers, among whom were the two hoodlums, Frank Falco and Anthony Casserino. Falco and Casserino were regular customers of the Vivere. They frequented the bar for two to three hours, four or five times each week. Cohen served them often but denied that he knew that they were criminals or gangsters. The victim, Robert Hunos, and his friend James Wargas had entered the Vivere bar, separately, some time between 8:00 p.m. and 11:30 p.m. Before 11:30 p.m. Cohen observed a gun in Falco’s shirt. *93 He reported his discovery to Trapeo. Just before midnight Falco and Casserino forced Hunos and Wargas into the kitchen in the rear of the bar. There Falco smashed Wargas’ face with the pistol and shot Hunos to death. Everyone in the bar heard the shot and started running; Cohen hurried to the kitchen, in the wake of his boss Trapeo as all the customers fled frantically in the opposite direction. On the way to the kitchen Cohen passed Casserino who was running and carrying two guns. In the kitchen he saw the dead body of Hunos lying in a pool of blood on the floor and found the bleeding Wargas holding his nose. Falco was seen standing near Hunos’ body. Cohen remained in the Vivere kitchen for several minutes but claims that he was too frightened to recall what was said or done there. Trapeo ordered Cohen to return to the bar and to send Linda Santini to the kitchen. Cohen did as he was told. He took "over the bartending chores from Linda Santini who proceeded to the kitchen where Hunos ’ body lay. Ten or 15 minutes later Linda Santini, Albie Trapeo, Frank Falco and the wounded Wargas re-entered the bar. At Falco’s command, Cohen served drinks to Falco and Wargas. Falco warned Cohen to “ forget what happened or you’ll get the same thing! ” Homents later Trapeo directed Cohen to “ watch the door ” and not to “ turn his head.” Trapeo turned down the lights of the now deserted bar. He then returned to the kitchen with Falco and Linda Santini as Cohen stood guard at the front door. Cohen said he heard Falco, Linda Santini and Trapeo running [1] ‘ around like crazy” in the rear. Trapeo and Falco dragged Hunos’ body out of the kitchen and into the street where they placed it in Wargas’ car for the trip to the river. The body gone, the three frightened conspirators, Cohen, Trapeo and Santini, reopened their doors for business. The lights in the Vivere went up again and Cohen returned to his place behind the bar. Hinutes later another shot came from the outside and hit the ventilator fan in the bar with a loud bang. The terrified Trapeo, Cohen and Santini promptly closed the bar for the night, two hours ahead of schedule, and went their several ways. When the police found Hunos ’ body in the river the trail led to the plaintiff and his friends. Detectives from the Homicide Squad closed in on the Vivere bar on July 13 and questioned Cohen, Santini and Trapeo. They all denied that Hunos was murdered by Falco in the Vivere Lounge. Cohen told the police that he knew nothing at all about the slaying. Cohen lied to the police on several occasions to protect Trapeo’s liquor license and investment in the Vivere. Linda Santini, Trapeo and Cohen had agreed among themselves to tell the police that no one had *94 been killed or wounded in the Vivere Lounge on the evening of July 11, 1963. The homicide squad detectives were unable to break Cohen’s story on July 13 and released him. The plaintiff returned to work at the bar. He and his two friends persisted in their stories that they knew nothing about the murder of Munos. On July 18, a week after the murder, Cohen was arrested by the police as a material witness and committed by a court to the Civil Jail in Brooklyn under $5,000 bail. Trapeo paid the bond and Cohen was set free. He promptly left New York City for a hotel in the Catskill Mountains where he remained for three days.
On Monday, July 22,1963,11 days after the murder of Munos, Cohen finally told the truth about the events of July 11 to the District Attorney and the police. His explanation for lying to all concerned until July 22 was that he was frightened — of Falco and Casserino — frightened for his life.
THE SOURCES OF THE BRESLIKT ARTICLE
The credible and uncontradicted evidence reveals that, before he wrote the article, Breslin had read two published newspaper accounts of the murder in the Vivere Lounge. Neither of the articles mentioned the plaintiff by name. The first item appeared in the Daily News of July 13, 1963. It identified the dead man as Robert Munos and quoted the police to the effect that the killing was a “ rubout, a professional type job.” The second news report appeared in the New York Herald Tribune of July 31, 1963. This account described the murder of Munos and the pistol whipping of Wargas. The Tribune article referred to “15 citizens [who] went home and forgot about” the murder they had witnessed. The writers described how the police solved the gangland murder, in spite of tight-lipped witnesses who refused to reveal what they knew about the killers. The July 31 Tribune news item printed photographs of the killers and reported that three witnesses were being held in jail by the police, for their own protection. The night before he wrote the article Breslin visited the Vivere Lounge in the company of two detectives who were engaged in the investigation of the slaying. They interviewed Albie Trapeo and inspected the kitchen of the premises. From the detectives Breslin learned about the details of the murder in the bar. He discovered that Cohen and Trapeo were eyewitnesses to the crime. From Trapeo, Breslin drew an account of the events which followed after Robert Munos was shot and killed on the kitchen floor of the Vivere Lounge. Trapeo told Breslin *95 about Cohen’s participation in the affair and claimed that Cohen had left the city for the mountains. Then Breslin sat down at his typewriter to write the sardonic story, “ A Change of Heart,” which the defendant, New York Herald Tribune, published in its 400,000 issue of Sunday, August 4, 1963.
A PUBLIC ISSUE WAS INVOLVED
The court finds that the Breslin article concerned an important public issue, a matter of public interest. It therefore comes within the scope of the New York Times rule. The Supreme Court has held that the First Amendment to the United States Constitution mandates unfettered discussion of public matters and encompasses all “ public issues.” (Time, Inc. v. Hill, 385 U. S. 374, 388, supra.)
All people are profoundly affected by deliberate murder, particularly gang-style assassinations committed by hoodlums whose business is crime. Every agency of government is intensely concerned with the destruction of public order which results when criminals kill those who oppose them and avoid prosecution by intimidating eyewitnesses into frightened silence. The fabric of society is weakened when citizens close their eyes to crime or foil the discovery of criminals by falsifying what they know about criminals. The terrible sway that underworld gangsters hold over hard-working small businessmen in our country has created fury and frustration among the American people for many years. Gangland assassins who prey upon each other create consternation among law-abiding citizens everywhere. Racketeers who execute their competitors and victims in public and then terrorize ordinary people into silence or complicity continue to outrage the entire body politic.[3]
This court takes judicial notice that depredations of organized criminals continue to cause widespread public concern and that gangsters who murder their victims in public and intimidate witnesses destroy public order and tranquility.
*96 In Cole Fisher Rogow, Inc. v. Carl Ally, Inc. (29 A D 2d 423, 426), the court emphasized that judicial notice ought to be taken of matters of legitimate public interest in the following terms : ‘ ‘ The court is not bound to take judicial notice of matters of fact. However, it may and frequently does so where ‘ the nature of the subject, the issue involved and the apparent justice of the case ’ (Hunter v. New York, Ontario & Western R. R. Co., 116 N. Y. 615, 621) so dictate.” Text writers universally take the same position and say “ A judge is not expected to shut his eyes and ears to matters of public notoriety and general cognizance.” (4 Bender’s New York Evidence, § 170, p. 7; cf. 9 Wigmore, Evidence [3d ed.], Judicial Notice, § 2571 et seq.)
The manner of the deliberate murder in the Yivere Lounge and its sequel of terror and intimidation created a public issue of profound importance.
A wide variety of events have been found by courts to be matters of public concern.
In United, Med. Labs. v. Columbia Broadcasting System (404 F. 2d 706) the New York Court of Appeals declared that a series of broadcasts by Walter Cronkhite of CBS, on the inaccuracies of tests of clinical specimens and risk such errors presented to public health, concerned matters of public interest. The court said (p. 711), inter alia, that the conditions alleged in the broadcasts were ‘ ‘ of such inherent public concern and stake that there could be no possible question as to the applicability of the New York Times standard ”. Certiorari was denied by the Supreme Court of the United States (394 U. S. 921). Several weeks later, the United States Court of Appeals of the Fifth Circuit in Time, Inc. v. McLaney (406 F. 2d 565, supra) struck the same note. The libelous report in the McLaney case was entitled “ The Scandal in the Bahamas.” The article was a 15-page exposé of the activities of American gangster-gamblers in the Bahamas. The plaintiff was mentioned by name and linked to the gangsters in the article. The defendant moved for summary judgment on the theory that the New York Times doctrine controlled. The District Court denied the motion but the Court of Appeals reversed the lower court on appeal and said (p. 573): “We conclude that the constitutional privilege extends to discussions by specific individuals, not associated with any government, if those individuals are involved in matters of important public concern. ’ ’
The Supreme Court denied certiorari (395 U. S. 922).
In 1969 the Court of Appeals of the Third Circuit took the same position in Rosenbloom v. Metromedia (415 F. 2d 892). Rosenbloom brought action against the broadcasting station for *97 libel because one of its news programs described a police raid on his home and his arrest for possession of 1,000 “ girlie ” books. Later broadcasts were in the same vein. There was no justification for the defendant to report that the plaintiff was suing the city to enjoin obscenity raids throughout the city. The facts were that the plaintiff only sought to stop police harassment of himself and to assert that his publications were not obscene. A trial in the District Court before a jury resulted in a verdict for the plaintiff of $25,000 compensatory damages and $750,000 punitive damages. The District Court reduced the punitive award to $250,000. The defendant appealed on the theory that the action was governed by the New York Times doctrine. The Court of Appeals agreed, citing Time, Inc. v. Kill (385 U. S. 374, supra). At page 896 the court said: “ Contrary to the view of the district court, we do not consider the absence of a public figure of controlling importance here. Considering the type of news broadcasts involved as well as the established public interest in the subject matter, we conclude that the fact that plaintiff was not a public figure cannot be accorded decisive importance if the recognized important guarantees of the First Amendment are to be adequately implemented.” (Emphasis supplied.) The Circuit Court cited Pickering v. Board of Educ., (391 U. S. 563, supra); United Med. Labs. v. Columbia Broadcasting System, (404 F. 2d 706, supra) and Time, Inc. v. McLaney (406 F. 2d 565, supra) for the propostion that when the report related to “ matters of public interest, ’ ’ the Times rule and the guarantees of the First Amendment to the United States Constitution applied. Certiorari has been granted by the Supreme Court in the Bosenbloom case (397 U. S. 904).
Many lower court decisions in New York and other jurisdictions speak the language of the expanded Times rule and apply the doctrine to “ matters of public interest.”
Garfinkel v. Twenty-First Century Pub. Co. (30 A D 2d 787, app. dsmd. 22 N Y 2d 970) held that the owner and publisher of a high school scouting report, whom defendant referred to as a “ flesh peddler,” came within the Times doctrine.
In Fotochrome v. New York Herald Tribune (61 Misc 2d 226), an article which “ purported to be an expose ” of financial manipulations by the president and chairman of a corporation listed on the American Stock Exchange, was found to involve a matter of public interest.
The All Diet Food Distrs. v. Time, Inc. (56 Misc 2d 821) case determined that an article, which condemned food fads as frauds, spoke of a public issue.
*98 The case of Bon-Air Hotel v. Time, Inc. (295 F. Supp. 704, affd. 426 F. 2d 858) involved a satirical article about a Georgia hotel which charges high prices for poor accommodations to golf professionals and enthusiasts who attended the nearby Masters Golf Tournament. The Times doctrine was likewise applied in the case of Cerrito v. Time, Inc. (302 F. Supp. 1071) when the plaintiff was reported to be Mafia representative. See also the cases of Cullen v. Grove Press, (276 F. Supp. 727); Altoona Clay Prods. v. Dun & Bradstreet, (286 F. Supp. 899) and Sellers v. Time, Inc. (299 F. Supp. 582, affd. 423 F. 2d 887) for examples of issues found to be of public interest and subject to the Times rule.
Some observations are in order with regard to the conduct of the plaintiff and his associates after they had witnessed the slaying of Munos in the Vivere Lounge. Cohen and Trapeo were truly frightened by the awful crimes they had seen. At least Cohen was terrorized by the gangster Falco. After Falco departed, Cohen conspired with his boss, Trapeo, and coworker, Santini, to conceal the crime and the criminals from the police — not to escape from Falco, but to save Trapeo’s financial investment in the Vivere Lounge! Cohen stood firm with his friends against the police and the District Attorney who were investigating the murder. Cohen knew that Trapeo and Santini had helped Falco to dispose of Munos’ body. He had himself played the role of lookout at Trapeo’s request and stood watch at the door against customers who might return while the body was being removed from the kitchen floor. Then for 11 days Cohen lied to detectives, the Assistant District Attorney and to a Judge. Only when he and his associates Trapeo and Santini were jailed by the court as material witnesses did the plaintiff come forward to acknowledge that he was an eyewitness to the murder of Munos in the Vivere Lounge. For those 11 days Falco and Casserino remained at large. The criminals owed their escape, in some measure at least, to the failure of the plaintiff to tell the police what he knew. Thus did Cohen “ thrust himself into the vortex ” of the matter. By his watchman’s role, by his silence and deceit he threw himself into the midst of a matter of critical public concern — on the side of the criminals; he methodically concealed the crime.
The plaintiff’s antisocial conduct, which continued to frustrate law enforcement officials and a court for 11 days stripped him of a legitimate call upon this court for redress when a reasonably accurate but satirical article is published about that conduct.
*99 In Associated Press v. Walker (388 U. S. 130) the Supreme Court denied recovery to a private citizen in a libel case who, by his purposeful activities, “ thrust himself into the ‘ vortex 5 of an important public controversy.”'
In accordance with the procedures recommended in Rosenblatt v. Baer (383 U. S. 75, 88) as extended to public issues in Wasserman v. Time, Inc. (supra), we now turn to a consideration of the question whether the plaintiff has shown actual malice, with convincing clarity. (New York Times Co. v. Sullivan, 376 U. S. 254, 285-286, supra.) In this regard the plaintiff points to a number of derogatory statements about him in the Breslin article which do not appear to be based on any facts known to the defendants, e.g., “ Gunmen, action guys * * * were Hy’s idea of people ” and “ He was Hy Cohen of the Backets,” and Hy was going to “ get a job as a cook in a summer camp,” etc. These unflattering characterizations of the plaintiff were stylistic and satirical touches of the author’s piquant pen. In any event, they may not be read out of the context of the entire article and thus serve to satisfy the “ convincing clarity ” test which the plaintiff must meet.
In Cambuzza v. Time, Inc. (18 A D 2d 351, 354) the court said: ‘ ‘ the article must be considered as a whole and its meaning gleaned not from isolated portions thereof but rather from the entire article and the apparent object of the writer. (More v. Bennett, 48 N. Y. 472; Klaw v. New York Press Co., 137 App. Div. 686 * * •).”
Even if these unsubstantiated references to the plaintiff were read out of context and found to be false, standing alone, they would not suffice to prove the defendant’s actual malice with convincing clarity. Truth or falsity is not the constitutional test; the statements must be published with actual knowledge of their falsity or with reckless disregard for their falsity.
In Curtis Pub. Co. v. Butts (388 U. S. 130, 152, supra), Haul ait, J. said: u we have rejected * * * the argument that a finding of falsity alone should strip protections from the publisher. New York Times Co. v. Sullivan, supra, at 272. We have recognized ‘ the inevitability of some error in the situation presented in free debate,’ Time, Inc. v. Hill, supra, at 406 * * * and that ‘ putting to the pre-existing prejudices of a jury the determination of what is ‘1 true ’ ’ may effectively institute a system of censorship. ’ ’ ’ The cases have uniformly held that ‘ ‘ investigatory failures alone ’ ’ do not establish that the publication has been deliberately falsified or recklessly published. (Cf. Curtis Pub. Co. v. Butts, supra, p. 153; New *100 York Times v. Sullivan, supra pp. 286-288, 292; and Garrison v. Louisiana, 379 U. S. 64, 73-75, 79.)
In Garrison v. Louisiana (supra, p. 74) the court said: “ since ‘ * * * erroneous statement is inevitable in free debate, and * * * it must be protected if the freedoms of expression are to have “ breathing space ” that they “ need * * * to survive ” * * * ’ only those false statements made with a high degree of awareness of their probable falsity demanded by the New York Times may be the subject of either civil or criminal sanctions.” And in St. Amant v. Thompson (390 U. S. 727, 733, supra) the court said: “ Failure to investigate does not in.itself establish bad faith.” However, the proof shows that the defendants did investigate the story and that the author did make a good faith check of his sources.
The credible testimony and uncontradicted statements made by witnesses in the case reveal that Jimmy Breslin was a regular columnist for the New York Herald Tribune who often wrote articles about the underworld and crime. Breslin’s style was satirical and humorous.[4] His literary technique involved the use of .sardonic humor to expose the grim reality of things as they are. In pursuit of the story about the killing of Hunos in the Vivere Lounge, Breslin interviewed police officials both in headquarters and at the precinct level. He conferred with the District Attorney assigned to investigate the crime; read two published news stories about the affair; visited and inspected the scene of the murder; and interviewed the plaintiff’s boss, Trapeo, who supplied him with eyewitness information about the assassination of Hunos. Trapeo also described to Breslin the role and life style of the plaintiff Cohen. Finally, many statements in the Breslin article are confirmed by the plaintiff’s own testimony and admissions. For example: documentary evidence disclosed, and Cohen admitted, that he and Trapeo had been arrested by the police and that both of them were imprisoned by a Judge as material witnesses in the Hunos murder investigation. The article was likewise corroborated by the plaintiff himself, because it reported the fact that he went to jail overnight and was released next morning. In at least two other .respects Cohen confirmed the accuracy of Breslin’s information when he conceded that he never returned to his job as a Vivere bartender and that he spent the summer of 1963 at a hotel in the Catskill Hountains. Since Breslin *101 did not interview the plaintiff before writing “ A Change of Heart ” about him, these facts could only have been the products of the author’s investigation and conversations with persons who knew Cohen intimately. The evidence confirms most of the internal facts contained in the tale that Breslin told. (Cf. People v. Malinsky, 15 N Y 2d 86, 91 and People v. Verrecchio, 23 N Y 2d 489, 492.) The plaintiff’s admissions and the inescapable inferences which must be drawn from the entire testimony negate “ a conclusion that [Breslin] in fact entertained serious doubts as to the truth of his publication.” The proof is to the contrary. By .showing the sources of the information on which they relied in publishing the article and by proving the existence of facts within Breslin’s knowledge calculated to make him believe that what he wrote was the truth, the defendants have refuted the plaintiff’s claim of actual malice. (Cf. Varvaro v. American Agriculturist, 222 App. Div. 213, 217.) The Varvaro decision reversed the trial court because the defendant had not been permitted to show absence of malice by proving the sources of his information and existence of facts which induced him to believe that what he wrote was true. (Schneph v. New York Post Corporation, 23 A D 2d 822, affd. 16 N Y 2d 1011; St. Amant, 390 U. S. 727, 731, supra.) Moreover the plaintiff has failed to demonstrate with ‘ ‘ convincing clarity” that defendants departed in any way from ‘‘ ordinary standards of responsible publishers ” in writing and printing the article in question. (Cf. Curtis Pub. Co. v. Butts, 388 U. S. 130, supra.)
Far from meeting the aforesaid ‘1 ordinary standards ’ ’ test, the plaintiff has not met the more rigorous standards of proof required in libel cases by showing that the defamatory statement was written about him 1 ‘ with knowledge that it was false or with reckless disregard of whether it was false or not.” (New York Times Co. v. Sullivan, 376 U. S. 254, 280, supra.)
MERE EXAGGERATION OR SATIRE ALONE DOES NOT MAKE A WRITING ACTIONABLE.
The Constitution does not prescribe nor proscribe the style of writing which an author may employ. There are almost as many literary styles as there are writers. The defendant Breslin however used a technique which falls into the general category of satire.
The satirist uses hints. He coins odd phrases. He creates incongruous images of men to tickle his audience to a surprised laughter of attention.
The weapons of satire are Melodrama and Burlesque. Melodrama ignores .some parts of the whole and magnifies others *102 to create startling effects. By this technique of omission of some facts and overemphasis of others the satirist seeks to create pictures more true to the underlying realities than the tame statement of everyday fact.
Burlesque exaggerates the weaknesses it seizes upon. It can be savage but it is predominantly gay and playful. Burlesque, nevertheless, focuses on the foolish core of a solemn thing and thus enhances its persuasiveness.
The defendant’s satire was written about the hapless victim of a gangland murder and one eyewitness to the slaying who was terrorized into enforced silence by the killers. It painted a stark word picture of Cohen’s fright. With sardonic humor Breslin described Cohen’s frantic flight to avoid the murderous gangsters as well as to escape the police who were hot on the killer’s trail. The humor was not funny, except on the surface. Murder and terror are not the subjects of comedy. They are rather the subjects of satire which superficially conceals a tragic or a solemn happening. Our courts have held that mere exaggeration, irony or wit does not make a writing libelous unless the article would be libelous without the exaggeration, irony or wit.
In Briarclif Lodge Hotel v. Citizen-Sentinel Publishers (260 N. Y. 106, 118-119) the Court of Appeals considered the satirical style of some writers and declared: “ Mere exaggeration, slight irony or wit, or all those delightful touches of style which go to make an article readable, do not push beyond the limitations of fair comment. Facts do not cease to be facts because they are mixed with the fair and expectant comment of the story teller, who adds to the recital a little touch by his piquant pen.”
In Sellers v. Time, Inc. (299 F. Supp. 582), a Federal District Court for the Eastern District of Pennsylvania, writing about a humorous account of a golfer who hit a partner behind him with a golf ball, held that an article did not lose its privilege because it was written in a “flippant” and “smart alecky ” style. The unsubstantiated portions of the statement about the plaintiff in the Breslin article were cast in an ironic mold. Although the article was not literally true in every detail, it presented a fair sketch of a confident talkative bartender who was reduced to speechlessness, self-effacement and flight by gangsters and a killing in his bar. A fair reading of the whole article would not produce a different impression on the mind of a reader than this. Satire may embarrass but embarrassment is not enough. (Kimmerle v. New York Evening Journal, 262 N. Y. 99; cf. Fleckenstein v. Friedman, 266 N. Y. 19.)
*103 LAW OF THE CASE
The plaintiff has urged the court to adopt an earlier Special Term decision of Mr. Justice Pino in this case, which denied defendant’s motion for summary judgment. Justice Pnro declared that no public issue existed and declined to apply the Times rule. A .summary judgment decision is based upon documents and affidavits only. It is in the nature of summary judgment to determine whether or not facts exist. It does not usually establish the law of the case, unless granted. In Snelwar v. Snelwar (27 Misc 2d 933, 934) the trial court, Pittohi, J., declared that: ‘ ‘ An order denying summary judgment only decides that a question of fact exists for determination at a trial (Sillman v. Twentieth Century-Fox Film Corp., 3 N Y 2d 394, 404; Falk v. Goodman, 7 N Y 2d 87, 91). It does not establish the law of the case any more than the granting or denial of a temporary injunction * * * neither the doctrine of res judicata nor that of the law of the case is applicable, because the order denying summary judgment lacked the quality of finality and was not a conclusive adjudication precluding further consideration of the issues (Rager v. McCloskey, 305 N. Y. 75, 78).”
In Aufiero v. New York Life Ins. Co. (74 N. Y. S. 2d 277, 279), the court declared that a denial of a motion for summary judgment does not necessarily establish the law of the case. The Appellate Division affirmed in 274 App. Div. 928. (But cf. Telaro v. Telaro, 25 N Y 2d 433, 437, where the trial court applied the law-of-the-case doctrine to a Special Term decision in summary judgment and the Appellate Division affirmed.)
As was customary, the depositions and affidavits of the plaintiff, as the opposing party to the motion, received the most favorable construction possible. The Justice in Special Term did not hear the testimony of live witnesses sifted or winnowed through the screen of cross-examination, and might well have discovered no public issue in the article. However, this court has heard all of the evidence and examined all of the documents. I find that the deliberate slaying of a citizen in a public place by gangsters who then intimidated a dozen eyewitnesses to the extent that they obstructed a police investigation and were ready to commit perjury, created an important public issue.
Mr. Justice Holmes long ago succinctly stated that doctrine of the “ law of the case ” as follows: 11 In the absence of statute the phrase, law of the case, as applied to the effect of previous orders on the later action of the court rendering them in the *104 same case, merely expresses the practice of courts generally to refuse to reopen what has been decided, not a limit to their power.” (Messenger v. Anderson, 225 U. S. 436, 444.) Since the law-of-the-case principle concerns issues which have been litigated and decided (United States v. United States Smelting Co., 339 U. S. 186,198), and is only addressed to the good sense of the court, it does not bind this court. (Cf. Poster Exchange v. National Screen Serv. Corp., 362 F. 2d 571, 574.)
In the case of Dictograph Prods. Co. v. Sonotone Corp. (230 F. 2d 131, cert. den. 352 IT. S. 883), Judge Weinfeld of the Southern District of New York denied defendant’s initial motion for summary judgment but Judge Ryan of the same court later granted that motion on the merits.[5] On appeal the plaintiff argued that the initial denial had become the law of the case and that the Second Circuit was obliged to reverse without even considering the correctness of the latter decision. Judge Hand disagreed, holding: “ Is the doctrine described by that phrase [law of the case] an inflexible rule of law, or only a cautionary admonition to be applied when the occasion demands it? * * * No one will suggest that the first judge himself may not change his mind and overrule his own order, so that the basis of the doctrine can only be that there are reasons why the second judge may not do so that do not exist when the first does. We can think of only two such reasons: (1) the second judge should defer to the rule of the first as a matter of mutual respect between members of the same court; (2) if he does not so defer, the defeated party may shop about in the hope of finding a judge more favorably disposed * * * there is no imperative duty to follow [an] earlier ruling ”. (230 F. 2d 131, 13A-135.)
The article viewed as a whole and read in the spirit in which it was written, while not literally true in all details, was substantially an accurate report of murder in the Vivere Lounge. It was a satirical, semifietional account of a real person who became an eyewitness to that murder. No reader could reasonably conclude that the plaintiff was being depicted as other than a bartender who had witnessed a gangland murder, was terrorized by the killer and had lied and fled to save his life.
Accordingly the motion for a directed verdict is granted in favor of the defendants.

. In Rosenblatt v. Baer, (383 U. S. 75, 88) the court said “ [in a libel case] it is for the trial judge in the first instance to determine whether the proofs show respondent to be a (public official

. In Wasserman v. Time, Inc. (supra, p. 923) Judge Skelly Wright, concurring, in the United States Court of Appeals, D. C. Cir., declared that the procedure in Rosenblatt v. Baer (supra) should also apply in libel cases which involve matters of “ public concern.” Judge Wright recommended the following “ two-step procedure ” to “ provide[s] the protection of the First Amendment freedom that Times sought to make secure in areas of public concern ” (p. 922):
“If the case survives the defendant’s summary judgment motion, the trial court at the close of the plaintiff’s case must decide whether actual malice has been shown with ‘ convincing clarity.’ In making this judgment the court will judge the credibility of the witnesses and draw its own inferences from the evidence. If the trial is permitted to proceed, the court will be called upon again to make a judgment on the actual malice issue at the close of all of the evidence. If the motion for a directed verdict at this stage of the trial is denied, the actual malice issue, along with the other issues, is then submitted to the jury under the Times instruction without any indication from the court or counsel that the court has decided that the evidence shows actual malice with ‘ convincing clarity.’ ”

. A report by the President’s Commission oil Law Enforcement and Administration of Justice (Feb., 1967), The Challenge of Crime in a Free Society: “ The public sees crime as one of the most serious of all domestic problems.” (P- 49)
Page 187 et seq. — ■ findings:
1. Organized crime uses torture and .murder to deter witnesses.
2. Gambling and loan sharking produce the highest profits for the underworld— running into billions of tax free dollars to corrupt public officials and others.
3. The existence of crime, the talk of crime, the reports of crime and the fear of crime have eroded the basic quality of life of many Americans.

. A word is not a crystal, transparent and unchanged, it is the shin of living thought and may vary greatly in color and content according to the circumstances and the time in which it is used. (Towns v. Eisner, 245 U S. 418, 425.)

. In Simmons Co. v. Grier Bros. Co., (258 U. S. 82, 88) the court said that the denial of a motion for summary judgment was only an interlocutory order and “ the court at any time before final decree may modify or rescind it.” (See Marconi Wireless Co. v. United States, 320 U. S. 1, 47-48.)