516 P.2d 193

**S. N. WEEKS et al., Plaintiffs-Appellants,**

v.

**M–P PUBLICATIONS, INC., a corporation, et al., Defendants-Respondents.**

**No. 11201.**

Supreme Court of Idaho.

Oct. 24, 1973.

Rehearing Denied Dec. 7, 1973.

Webb, Pike, Burton & Carlson, Twin Falls, for plaintiffs-appellants.

Benoit, Benoit & Alexander, Robert M. Harwood, Twin Falls, for defendants-respondents.

McFADDEN, Justice.

The plaintiffs, S. N. Weeks, Walter C. Bentzinger and Elwin L. Tinker, instituted

this action seeking general damages claimed to have arisen from a publication of an editorial in the North Side News, a weekly newspaper published at Jerome, Idaho. Defendant M–P Publications, Inc., is the corporate publisher of the newspaper and the two individual defendants are the publishers of the paper.

The defendants moved to dismiss the complaint, or in the alternative to grant summary judgment in their favor. Their motion was supported by affidavits, one of which had attached as an exhibit the front page of the newspaper containing the alleged defamatory material. The trial court granted defendants' motion to dismiss and this appeal resulted.

Plaintiffs' sole assignment of error brings before this court the issue of whether the trial court erred in dismissing their complaint.

Plaintiffs in their complaint allege that they are members of the city council of Jerome, and that the defendants, the publishers of the weekly Northside News, caused to be printed a malicious, false and libelous editorial concerning them.[1] This

1. *"Editorial Opinion*
    Abusive Government
    '.  .  . It is the Right of the People to alter or to abolish it  .  .  .'
    In Congress Assembled
    July 4, 1776
    A Declaration of Independence
    With flagrant disregard for the wishes of the voters who put them in office to serve the people, three members of the Jerome City Council satisfied a personal vendetta with the chief of police Tuesday night and, in effect, fired him.
    There is no use discussing further at this point the fine qualities of the man these councilmen so maliciously discharged; this has been done repeatedly by everyone in town.
    There is no further use at this time in expressing dismay at the arrogance of these three little men in ignoring a petition with over 600 names on it pleading with them to retain Chief Puntney.
    There is no further use at this time in discussing the huge number of interested citizens who attended Tuesday's council meeting to endorse and support the chief.
    When leading members of the clergy along with equally qualified professional law enforcement people and hundreds of interested

citizens are all willfully and blatantly ignored, then the time has arrived to attack this problem from another angle.
    Councilmen Bentzinger, Weeks and Tinker have shown us that they have no faith in or place no value on democracy.
    They have set themselves above the people who put them in office and they apparently think they are going to get away with it.
    We think it is now time to give these three teeny tyrants a short course in Democracy in Action.
    The Idaho Constitution provides for the fate of despots, even insignificant ones like these three stooges.
    We urge that these councilmen be recalled as soon as possible.
    We ask all citizens to involve themselves in this important project.
    For the cause now far transcends the good man involved.
    The basic tenets of our government are what are now at issue.
    We cannot allow these three men, out of ignorance or out of vicious willfulness to threaten our basic rights as free Americans.
    There is a meeting tonight (Thursday) at the Jerome county courthouse to discuss recall petitions for these men.

editorial captioned "Editorial Opinion, Abusive Government," appeared on the front page of the newspaper on January 6, 1972. They further alleged that the article was designed to defame and damage the plaintiffs both in their official positions and individually.

The trial court in ruling on the defendants' motion to dismiss stated in a memorandum opinion:

"It seems to me that at most the language complained of is unpleasant, annoying and irksome and may well have subjected the plaintiffs to jest or banter so as to affect their feelings all of which creates something less than libel per se. It is impossible for me to believe that these statements, obnoxious though they may be, tend to expose plaintiffs to public hatred, contempt or disgrace."

It is the position of the plaintiffs on this appeal that the words used by the defendants are libelous per se. It is worthy of note that the plaintiffs allege only two of the statements out of the editorial are libelous per se, i. e., "teeny tyrants" and "these three stooges." In this case the plaintiffs have not alleged that they suffered any special damages, but only alleged that they suffered general damages, and their prayer for relief was for general damages only.

■ Although there is a division of authority in other jurisdictions (see, Annot. 86 A.L.R. 848 [1933]; Restatement, Torts §§ 568, 569 [1938]), in Idaho the rule is that in order to maintain a libel action without a plea of special damages, a plaintiff must establish that the words complained of are libelous per se. Jenness v. Co-operative Publishing Co., 36 Idaho 697, 213 P. 351 (1923); Gough v. Tribune-Journal Co., 75 Idaho 502, 275 P.2d 663 (1954).

■ The issue presented is whether the court or the jury (or finder of the facts) should determine whether the particular words employed are libelous per se. In other words, is it a matter of law or is it a matter of fact whether certain words used in an alleged defamatory publication amount to libel per se. This court held in Bistline v. Eberle, 88 Idaho 473, 401 P.2d 555 (1965), that if the language used is plain and unambiguous, it is a question of law for the court to determine whether it is libelous per se, otherwise it is a question of fact for the trier of fact. See also, Gough v. Tribune-Journal Co., 75 Idaho 502, 275 P.2d 663 (1954).

Both parties to this appeal invite the court to examine the published material (Exhibit 1) to determine the question of whether the challenged portions are libelous per se. The whole record is thus before the court for this purpose. Stewart v. Arrington Const. Co., 92 Idaho 526, 446 P. 2d 895 (1968). See, Gough v. Tribune-Journal Co., 73 Idaho 173, 249 P.2d 192 (1952), Gough v. Tribune-Journal Co., 75 Idaho 502, 275 P.2d 663 (1954).

In its examination of this printed material this court must keep in mind certain rules previously adopted.

"In determining the defamatory character of a publication the article must be read and construed as a whole; the words used are to be given their common and usually accepted meaning and are to be read and interpreted as they would be read and understood by the persons to whom they are published." Gough v. Tribune-Journal Co., 75 Idaho 502 at 508, 275 P.2d 663, at 666 (1954).

In Gough v. Tribune-Journal Co., 73 Idaho 173, 249 P.2d 192 (1952), the court in deciding what words are to be considered as libelous per se, stated:

" 'In order to be libelous per se, the defamatory words must be of such a na-

---

We urge you to attend.
If you cannot, then we respectfully ask you to sign the recall petitions that will undoubtedly be forthcoming.
If there ever was a just cause for anger on the part of our citizens it is this one.

We must act swiftly and mercilessly in putting our city government back on the track our Mayor and Councilman Everheart tried so hard to keep it on."

ture that the court can presume as a matter of law that they will tend to disgrace and degrade the person or hold him up to public hatred, contempt, or ridicule or cause him to be shunned and avoided; in other words, they must reflect on his integrity, his character, and his good name and standing in the community, and tend to expose him to public hatred, contempt or disgrace. The imputation must be one which tends to affect plaintiff in a class of society whose standard of opinion the court can recognize. It is not sufficient, standing alone, *that the language is unpleasant and annoys or irks plaintiff, and subject him to jests or banter, so as to affect his feelings.'* (Emphasis supplied.)" 73

Idaho at 179, 249 P.2d at 195.

In this case the trial court considered an action instituted by county commissioners for defamatory statements concerning official actions taken by them as public officials and held that the article reporting their actions as public officials was not libelous per se.

In 1964 the United States Supreme Court in New York Times v. Sullivan, 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686, interjected new concepts into the law of libel applicable to public officials. In the New York Times case, the Supreme Court held that the First Amendment, by reason of the Fourteenth Amendment, was applicable to all the states of the union. The Court unequivocally stated that "libel can claim no talismanic immunity from constitutional limitations. It must be measured by standards that satisfy the First Amendment." New York Times v. Sullivan, 376 U.S. at 272–273, 84 S.Ct. at 720. Within this context the Court rejected falsity of factual statement or harm to the public official or both as grounds for repressing speech which would otherwise be free. In rejecting the conjunction of factual error and injury to official reputation as providing a prima facie case, the Court stated: "[t]his is the lesson to be drawn from the great controversy over the Sedition Act of 1798 * * * which first crystallized a national awareness of the central meaning of the First Amendment." The Court held that privilege of "fair comment" was raised to constitutional level. See, William J. Brennan, Jr., Justice, U.S. Supreme Court, The Supreme Court and the Meiklejohn Interpretation of the First Amendment, 79 Harv.L.Rev. 1; Kalven, The New York Times Case; A Note on the "Central Meaning of the First Amendment," 1964 Sup.Ct.Rev. 191; Prosser, Torts, § 118 (4th ed., 1971). The Court not only recognized the qualified privilege of "fair comment" upon the conduct and qualifications of public officials, but also held that a broader privilege extended to protect a publisher against false statements of fact, provided they were made without "malice," i. e., a knowledge of its falsity or a reckless disregard of its truth or falsity.

Subsequent to the New York Times case, in several cases, the United States Supreme Court reiterated the definition of "malice" and held that actual ill will and a desire to do harm was not sufficient to defeat the privilege, Henry v. Collins, 380 U.S. 356, 85 S.Ct. 992, 13 L.Ed.2d 892 (1965), nor was mere negligence in publishing the defamation without verification, St. Amant v. Thompson, 390 U.S. 727, 88 S.Ct. 1323, 20 L.Ed.2d 262 (1968), nor was mere hatred, Garrison v. Louisiana, 379 U.S. 64, 85 S.Ct. 209, 13 L.Ed.2d 125 (1964).

In reading this editorial it is apparent that the publishers were perturbed at the actions taken by the council members in dismissal of the chief of police and were expressing themselves on public actions taken by them. It is further apparent from this editorial that the publishers were striving to seek redress for the asserted injustice by way of promoting further action by the citizens of the community. We find nothing ambiguous in this editorial and thus, as previously pointed out, whether it is libelous per se is a matter of law for resolution by the court. Gough v. Tribune-Journal Co., 75 Idaho 502, 275 P.2d 663 (1954).

In Jenness v. Co-operative Publishing Co., supra, 36 Idaho at 702, 213 P. at 353, the court in considering an allegedly libelous newspaper article, in language appropriate to the case, stated:

"While this article could not be called a classic in English literature, it is evident that the writer did not intend that it should be taken literally, but rather as a hyperbole of speech, and it would be so understood by the ordinary reader. It is not an unusual example of that form of ribaldry resorted to by a class of writers in describing the acts and conduct of their rivals or those they seek to criticize, where such writers have not the necessary skill or cleverness to express themselves in a more parliamentary manner. The article is an exemplification of a form of caricature that frequently appears, but in a more approved and refined form, in the current newspapers of the day, whereby they attempt to emphasize and set forth the shortcomings of men prominent in public life, or political parties, or reform movements against which the writer is seeking to create an adverse public opinion. Many of these writings and cartoons appearing in the public press are often useful in creating and directing public opinion toward needed reforms or the suppression of evil. If the law should hold all this class of articles, whether by pictures or writing, actionable *per se*, without a showing of malice or pecuniary loss to the party alleged to have been injured, it would so effectively restrain the press and tend to prevent it from giving the needed publicity to matters of vital importance to the public welfare that it would greatly impair one of the most potent influences for good we have, for all experience shows that there is no power so great in suppressing wrong as its pitiless exposure in the public press."

See also, Klahr v. Winterble, 4 Ariz.App. 158, 418 P.2d 404 (1966); Roane v. Columbian Pub. Co., 126 Wash. 416, 218 P. 213 (1923); Cohen v. New York Herald Tribune, Inc., 63 Misc.2d 87, 310 N.Y.S.2d 709 (1970).

In Greenbelt Cooperative Publishing Ass'n v. Bresler, 398 U.S. 6, 90 S.Ct. 1537, 26 L.Ed.2d 6 (1970), a real estate developer, Bresler, was involved in negotiations with the city council to obtain certain zoning ordinances for the construction of high-density housing on land owned by him. At the same time the city council was trying to acquire a tract of land from Bresler for a school. A newspaper characterized Bresler's negotiations as "blackmail." Noting that Bresler was a public figure while engaged in the negotiations, the Court held that the word "blackmail" as a matter of constitutional law was not slander when spoken in these circumstances and not libel when reported in the newspaper. The Court viewed the use of the word "blackmail" as simply "rhetorical hyperbole, a vigorous epithet used by those who considered Bresler's negotiating position extremely unreasonable." 398 U.S. 14, 90 S.Ct. 1542. In reaching this conclusion the Court emphasized the importance of a local newspaper concerned with matters of local governmental interest.

" 'The maintenance of the opportunity for free political discussion to the end that government may be responsive to the will of the people and that changes may be obtained by lawful means * * * is a fundamental principle of our constitutional system.' Stromberg v. California, supra, 283 U.S. [359] 369, 51 S.Ct. [532] 536 [75 L.Ed. 1117]." 398 U.S. at 11, 12, 90 S.Ct. at 1540.

See, Beckley Newspapers Corp. v. Hanks, 389 U.S. 81, 88 S.Ct. 197, 19 L.Ed.2d 248 (1967).

There can be no doubt that the circumstances surrounding the firing of Chief Puntney by the appellant city councilmen were subject to lively debate and substantial concern to all those who lived in the community. According to an article accompanying the editorial, citizens petitioned the appellants to retain chief Puntney prior to his dismissal; and after appellants fired Chief Puntney local high school

students paraded through the main streets of Jerome protesting the appellants' decision.

The appellants as public officials in the exercise of their official duties are not immune from the criticism and censure of public debate. The appellants voluntarily entered the arena of public debate and should not complain over ribald or robust criticism of their public action. Political epithets and hyperbole leveled against the actions of public officials are within the freedom of expression protected by the First Amendment afforded to citizens criticizing the function of their government. The editorial opinion contains words and phrases highly critical of the appellants which are nothing more than hardy, uninhibited statements. The editorial opinion under its title "Abusive Government," quoted from the Declaration of Independence: " . . . It is the right of the People to alter or to abolish it . . ." The unambiguous language of the editorial exhorts the citizenry to take action and to become involved against the appellants, while it characterizes the appellants' action as the result of "personal vendetta" and labels them as "three little men" and "three teeny tyrants." As Justice Brennan pointed out in New York Times v. Sullivan, supra, the concept of seditious libel lends to self-censorship and strikes at the very heart of democracy. In essence, political freedom ends when the government can use the courts to silence, to chill or to dampen the vigor of public debate.

The judgment of dismissal is affirmed. Costs to respondents.

DONALDSON, C. J., and McQUADE and BAKES, JJ., concur.

SHEPARD, Justice (specially concurring).

I concur in the result obtained by the majority on the ground that the material is not libelous per se. Since the majority opinion sets forth the editorial in its entirety, I would only observe that there is little danger that the editorial will go down in the annals of American journalism as a classic in political critique. The terms "Teeny Tyrants" and "Three Stooges" do not really invoke memories of the ringing tocsin of Thomas Paine, the muckraking of a Lincoln Steffens, or the odiousness of a Drew Pearson. I would have expected better of seasoned and veteran journalists.

Notwithstanding my judgments of the literary merits of the article, I concur with the ultimate conclusion of the majority but suggest that the technique utilized by the majority suggests the use of a sledge hammer to kill a mosquito. The majority correctly points out that in the instant case plaintiffs had the burden of establishing that the words complained of were libelous per se. I further agree with the majority that at best the language complained of herein was "unpleasant and annoys or irks plaintiff, and subjects him to jests or banter, so as to affect his feelings."

Having decided the case on the basis that the material was non-libelous, the majority opinion then gratuitously rolls up the heavy artillery of the decisions of the United States Supreme Court to establish that even if this case did involve "libel" and, if libelous were "false statements of fact" they would nevertheless have been constitutionally protected under the decisions of the United States Supreme Court. I point out that none of such circumstances existed herein.

I see no purpose to be served in playing the guessing game as to whether the cases cited by the majority from the United States Supreme Court would be sustained by the new membership of the High Court in proper cases, or whether the doctrines enunciated might be modified or eroded. Opinions can and do vary on that score. It is sufficient to say that those doctrines are inapplicable to the case at bar.