562 P.2d 791

**Michael A. CALDERO,**
**Plaintiff-Respondent,**

v.

**TRIBUNE PUBLISHING COMPANY and**
**James E. Shelledy, Appellants.**

**No. 11921.**

Supreme Court of Idaho.

March 4, 1977.

Rehearing Denied April 1, 1977.

Reed Clements of Clements & Clements, Lewiston, for appellants.

Fredric V. Shoemaker of Webb, Johnson, Redford & Greener, Boise, for plaintiff-respondent.

SHEPARD, Justice.

This is an appeal from an order, judgment, and sentence of and for contempt resulting from a newsman's refusal to disclose the identity of an informant. The existence and/or extent of a constitutionally based privilege from such disclosure is one of first impression in this jurisdiction.

Michael Caldero instituted an action in libel against the Tribune Publishing Company based on an article printed in the November 23, 1973, issue of the Lewiston Morning Tribune. The substance of the complaint was that the article contained "an unfair, false and malicious account" of an incident involving respondent while he was employed as an undercover agent for the Idaho Bureau of Narcotic Enforcement.

The article purported to describe in detail an incident of August 27, 1972, when Caldero and another agent were in a public park in Coeur d'Alene, Idaho, and in the process of an arrest of one Booth who had attempted to sell them narcotics. Booth was in the company of one Johnson and when an altercation ensued between Booth and the two agents, Johnson attempted to exit the scene in a vehicle. Although the precise facts are unclear and in dispute, it is at least agreed that Caldero fired three shots through the windshield of the Johnson-driven vehicle, two of which struck and injured Johnson.

The Tribune article in question appeared more than a year after the event under the by-line of Jay Shelledy and had as its focus the professional propriety of Caldero's conduct. Caldero claimed that "he fired in self-defense; that Johnson tried to run him down." In the article Caldero's assertion was contrasted with statements from an eyewitness and general observations from the county prosecutor and the State Attorney General. The following statements of

principal interest here were attributed to an undisclosed "police expert", i. e.:

"One police expert, in an off-the-record interview with the Tribune, said Caldero's justification for shooting didn't add up. His reasoning was derived mainly from logistical facts:

"—It was more than 90 minutes after sundown, so the lighting was too poor to see Caldero's small wallet badge at a distance greater than a few yards.

"—The distance between Caldero and Johnson's car when Johnson pulled out of the parking stall was not sufficient for the vehicle to have picked up much speed, especially since the tires were not getting traction in the loose gravel. Even the slowest agent could have stepped out of the way, unless he was determined to throw himself in front of the car to physically stop it. (Witnesses estimate the speed of the car at less than 10 m. p. h. when the shots were fired.)

"Caldero didn't have time to pull out his gun while running toward the car, dig out his wallet and show his badge, get out of the way of the car, replace his wallet and fire three shots with both hands on the gun as police are taught to fire.

"The position of the bullet holes and angle at which Johnson was hit put Caldero adjacent to the left front tire when he fired. Therefore, the car had missed him and he was in no apparent danger and in good position to shoot the tires out if he felt he had to fire his gun.

"But Booth's sale and Johnson's accomplice's role were not 'shooting' offenses. Caldero's only justification would be to maintain his life was in grave danger. Otherwise, it would be a case of a young policeman who panicked, or who became carried away."

Following the institution of the Caldero action, the Tribune filed an answer thereto and counsel for both parties proceeded to take depositions in the course of discovery. In that process Shelledy was deposed and questions were asked by counsel pertaining to the portion of the article on the opinion of the "police expert." Shelledy directly refused to answer questions which would in his opinion either reveal or lead to the identity of the source of the information. Shelledy thereafter was added as a party to the action together with an amended claim of invasion of privacy.

Shelledy was the subject of a motion to compel answers and the defendants filed a motion for summary judgment. Both motions were subject to a hearing at the conclusion of which the court ordered disclosure by Shelledy and reserved ruling on the summary judgment motion. The court entered an order which directed Shelledy to appear and answer three questions:

"1. Who is the person identified as the 'police expert' in the subject article?

"2. What was the time and place of the conversation between the deponent and the police expert?

"3. What did the police expert say, and what information did the police expert relate to the deponent, during the conversation or any other?"

The court, in reserving ruling on defendants' summary judgment motion, indulged in the following colloquy:

"MR. CLEMENTS (Defendants' attorney): * * * [A]ssuming that you would satisfy yourself, that the source existed, that the source gave the information to Mr. Shelledy, by way of his opinion as reported * * * would you feel that in this case there would be actual malice?

"THE COURT: My feeling would be at that point—and was prior to today at least—that under those facts, I would grant summary judgment. However, I must say because Mr. Shoemaker (plaintiff's counsel) was so strong and positive on his reading of KTVB, I would want, before I make such a ruling, I'd go back and look at that again * * *."

Apparently, plaintiff's counsel had argued to the district court that *Taylor v. KTVB*, 96 Idaho 202, 525 P.2d 984 (1974), holds that "malice" may be inferred from a publication which fails to distinguish mere opinion from fact. Parenthetically, we note that we do not read that case as so holding.

*See, Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 94 S.Ct. 2997, 41 L.Ed.2d 789 (1974). The district court opined:

"I believe * * * every opportunity to get his case into court must be given to the plaintiff; and as a consequence of that, I believe that the matter of the identity of the police expert is material; it's relevant. It goes, if necessary, to the heart or the crux of the plaintiff's case, or may. On the other hand, that information, when explored, may disclose insufficient information to support the plaintiff's case as against a Motion for Summary Judgment that * * * could be ruled upon if I reserve judgment on your Motion for Summary Judgment." (Tr. 4.)

Shelledy was again deposed and with respect to questions two and three of the court order, he indicated that the conversation took place by telephone approximately ten days prior to publication of the article. He explained to his anonymous source the circumstances surrounding the shooting incident as they had been revealed by his investigation and the anonymous source opined that under those circumstances in retrospect, Caldero's life was not in danger at the time of the shooting. Collateral questions which had been put to the appellant were rejected by the district court as being beyond the scope of his order.

Upon being asked the identity of the police expert, Shelledy read a statement declaring his refusal to answer was based upon the First Amendment of the United States Constitution and his professional code of ethics. Whereupon after being advised of the consequence of his conduct, he was judged in contempt and ordered incarcerated for a period of 30 days. It was ordered that thereafter he would then be re-examined as to the identity and source of his information. Upon order, the execution of that judgment has been stayed pending this appeal.

We note at the beginning of our analysis: "In 1958, a news gatherer asserted for the first time that the First Amendment exempted confidential information from public disclosure pursuant to a subpoena issued in a civil suit, * * *." *Branzburg v. Hayes*, 408 U.S. 665, at 685, 92 S.Ct. 2646 at 2659, 33 L.Ed.2d 626.

In a general context Idaho's statutory scheme contemplates:

"All persons, *without exception*, otherwise than is specified at the next two sections, who, having organs of sense, can perceive, and perceiving, can make known their perception to others, may be witnesses." I.C. § 9–201.

"A witness, served with a subpoena, must attend at the time appointed, with any papers under his control, required by the subpoena, and *answer all pertinent and legal questions*, and, unless sooner discharged, must remain until the testimony is closed." I.C. § 9–1301.

I.C. § 9–202 proscribes testimony from persons who are of unsound mind, under ten years of age and certain persons seeking to testify as to communications occurring before the death of a deceased person.

I.C. § 9–203 provides:

"There are particular relations in which it is the policy of the law to encourage confidence and to preserve it inviolate; therefore, a person can not be examined as a witness in the following cases: * * *."

Thereafter are proscribed certain communications between husband and wife, attorney and client, clergyman or priest and confessor, physician-patient, communications to a public officer under certain circumstances, counselor-student, certain communications between parent and child. We note that such statutory scheme has been considered and amended by our legislature as recently as 1972.

It is clear that appellant here falls within the clear requirement that he appear and testify and that his asserted privilege is not recognized nor is he excused from testifying under our statutes. It is not necessary and we do not examine any question as to conflict between any future rule of this Court and a statutory privilege. *See, R.E.W. Construction Co. v. District Court of Third Ju-*

*dicial Dist.*, 88 Idaho 426, 400 P.2d 390 (1965).

■ The general theory of the law and of the commentators has been that new testimonial privileges are disfavored since they obstruct the search for the truth. Wigmore has condemned the privileges as being derogations from the positive general rule that everyone is obliged to testify when properly summoned, and that privileges are obstacles to the administration of justice. 8 Wigmore, On Evidence, § 2192 (McNaughton's revision 1961). *See also*, McCormick, Evidence, 159 (2d ed. 1972). As stated in the preface to the American Law Institute's Model Code of Evidence, page 7: "Such a privilege suppresses valuable evidence to which the trier of the fact is competent to give its proper weight." To paraphrase Learned Hand in *McMann v. Securities and Exchange Comm.*, 87 F.2d 377 (2d Cir. 1937), we are not faced with one who is a client, a penitent, a patient or a spouse and since testimonial privileges are based upon specified confidential relationships, nobody by contract, express or implied, can abridge public duties.

A number of states provide newsmen a statutory privilege of varying nature,[1] but none has been provided in Idaho. Although often introduced, no such privilege has been provided by a federal statute.

■ We come then to appellant's major contention that he cannot be compelled to disclose the information sought here because of the freedom of the press guaranteed by the First Amendment to the Federal Constitution. It is argued that the disclosure of information acquired by a newsman from a confidential source would have a "chilling effect" on the ability of newsmen to utilize confidential sources and thus inhibit the media's ability to gather news and inform the public, all in violation of the First Amendment guaranty.

In 1958 the entertainer Judy Garland brought an action against Columbia Broadcasting System. *Garland v. Torre*, 259 F.2d 545 (2d Cir. 1958), cert. den. 358 U.S. 910, 79 S.Ct. 237, 3 L.Ed.2d 231. There, as here, plaintiff alleged false and defamatory statements published in newspapers. There, as here, during pretrial discovery proceedings Torre refused to divulge the name of a "network executive" to which the publication had referred as the source of certain statements. The witness refused to divulge, was held in contempt and the appeal followed. The opinion of that court was delivered by Potter Stewart, then sitting as a circuit judge. The argument was made therein, first that a newsman has an absolute privilege against disclosure of confidential sources which is protected by the First Amendment to the Constitution, and secondly, that at least in certain circumstances a confidential news source is protected by a qualified privilege. We read the opinion of Mr. Justice Stewart as rejecting both alternatives. As he stated:

"Freedom of the press, hard won over the centuries by men of courage, is basic to a free society. But basic too are courts of justice, armed with the power to discover truth. The concept that it is the duty of a witness to testify in a court of law has roots fully as deep in our history as does the guarantee of a free press.

"It would be a needless exercise in pedantry to review here the historic development of that duty. Suffice it to state that at the foundation of the Republic the obligation of a witness to testify and

---

1. Of interest is the Indiana statute which was amended in 1973 to eliminate the previous requirement that to qualify for the privilege a journalist must be employed by a newspaper having a certain circulation and a five-year longevity. Ind.Stat.Ann. § 34–3–5–1 (Supp. 1973). *See also*, Ala.Code tit. 7, § 370 (1960); Alaska Comp. Laws Ann. §§ 09.25.150–.220 (1973); Ariz.Rev.Stat.Ann. § 12–2237 (Supp. 1976); Ark.Stat.Ann. § 43–917 (1964); Cal. Evid.Code § 1070 (West Supp.1976); Ill.Ann. Stat. ch. 51, § 111 (Supp.1972); Ky.Rev.Stat. § 421.100 (1972); La.Rev.Stat. tit. 45, §§ 1451–1454 (Supp.1972); Md.Ann.Code art. 35, § 2 (1965); Mich.Comp. Laws Ann. § 767–5a (1968); Mont.Rev.Codes Ann. tit. 93, §§ 601–1–602–2 (1964); Nev.Rev.Stat. tit. 4, § 49–275 (1975); N.J.Stat.Ann. § 2A:84A–21 (1976); N.M.Stat.Ann. § 20–1–12.1 (Supp.1975); N.Y. Civil Rights Law § 79–h (McKinney 1976); Ohio Rev.Code Ann. §§ 2739.04, 2739.12 (1971); Pa.Stat.Ann. tit. 28, § 330 (Supp.1976).

the correlative right of a litigant to enlist judicial compulsion of testimony were recognized as incidents of judicial power of the United States. [citations omitted] Whether or not the power to invoke this judicial power be considered an element of Fifth Amendment due process, its essentiality to the fabric of our society is beyond controversy. As Chief Justice Hughes put it: 'One of the duties which the citizen owes to his government is to support the administration of justice by attending its courts and giving his testimony whenever he is properly summoned.'

\* \* \* \* \* \*

"If an additional First Amendment liberty—the freedom of the press—is here involved, we do not hesitate to conclude that it too must give place under the constitution to a paramount public interest in the fair administration of justice. 'The right to sue and defend in the courts is the alternative of force. In an organized society it is the right conservative of all others, and lies at the foundation of orderly government.' "

Although certiorari was denied, 358 U.S. 910, 79 S.Ct. 237, 3 L.Ed.2d 231, and we are not to speculate thereon, nevertheless, we deem it significant that *Garland v. Torre* was cited in the opinion of Mr. Justice White in *Branzburg v. Hayes*, 408 U.S. 665, 92 S.Ct. 2646, 33 L.Ed.2d 626 (1972), but is strangely missing in the dissent authored by Mr. Justice Stewart.

Except as noted above we find ourselves without guidance in the United States Supreme Court decisions in cases involving a newsman's refusal to divulge confidential informants in the course of civil litigation. Both parties hereto rely upon and cite heavily from *Branzburg v. Hayes, supra.* That decision involved a trilogy of cases (*Pappas, Caldwell* and *Branzburg*), all of which were cast in the context of the refusal of newsmen to divulge sources of confidential information and/or information received under a confidential agreement when subpoenaed to appear before a grand jury.

There, as here, it was argued that the First Amendment insulated completely or to a limited degree a newsman divulging confidential sources or confidential information. In the lower courts the assertion of the petitioners, Branzburg and Pappas, were rejected and that rejection of the privilege was upheld on appeal. In the third case, *Caldwell* (*Caldwell v. United States*, 434 F.2d 1081), the Ninth Circuit had upheld the petitioner's claim of privilege holding that absent some special showing of necessity he was insulated from disclosure on the basis of the First Amendment. In *Caldwell,* that decision of the Ninth Circuit Court of Appeals was reversed.

While as noted above, *Branzburg* was cast in the criminal area and testimony before a grand jury, nevertheless, we deem certain language therein to be of guidance. It was stated by Mr. Justice White:

"Until now the only testimonial privilege for unofficial witnesses that is rooted in the federal constitution is the Fifth Amendment privilege against compelled self-incrimination. We are asked to create another by interpreting the First Amendment to grant newsmen a testimonial privilege that other citizens do not enjoy. This we decline to do.

\* \* \* \* \* \*

"We are admonished that refusal to provide a First Amendment reporter's privilege will undermine the freedom of the press to collect and disseminate news. But this is not the lesson history teaches us. As noted previously, the common law recognized no such privilege, and the constitutional argument was not even asserted until 1958. From the beginnings of our country the press has operated without constitutional protection for press informants, and the press has flourished. The existing constitutional rules have not been a serious obstacle to either the development or retention of confidential news sources by the press. \* \* \* If newsmen's confidential sources are as sensitive as they are claimed to be, the prospect of being unmasked whenever a judge determines the situation justifies

it, is hardly a satisfactory solution to the problem. For them, it would appear that only an absolute privilege would suffice. "We are unwilling to embark the judiciary on a long and difficult journey to such an uncertain destination. The administration of a constitutional newsman's privilege would present practical and conceptual difficulties of a high order. Sooner or later, it would be necessary to define those categories of newsmen who qualified for the privilege, a questionable procedure in light of the traditional doctrine that liberty of the press is the right of the lonely pamphleteer who uses carbon paper or a mimeograph just as much as the large metropolitan publisher who utilizes the latest photocomposition methods." 408 U.S. at 689–690, 698–699, 702–704, 92 S.Ct. at 2661, 2665, 2667–2668.

Four of the Justices, Stewart, Brennan, Marshall and Douglas dissented. Mr. Justice Powell filed a special concurring opinion and it is argued that such detracts from the conclusiveness of the plurality opinion. We do not agree. Mr. Justice Powell concurred in the opinion of the Court written by Mr. Justice White and while the Powell special concurring opinion is brief and somewhat enigmatic, we read it only to state that if an "investigation is not being conducted in good faith [the newsman] is not without remedy."

Although in different contexts, the United States Supreme Court has prior to *Branzburg* used strong and compelling language regarding asserted derogations of the testimonial privilege. In *United States v. Bryan*, 339 U.S. 323, 70 S.Ct. 724, 94 L.Ed. 884 (1950), the Court stated:

"On the other hand, persons summoned as witnesses by competent authority have certain minimum duties and obligations which are necessary concessions to the public interest in the orderly operation of legislative and judicial machinery. A subpoena has never been treated as an invitation to a game of hare and hounds, in which the witness must testify only if cornered at the end of the chase. If that

were the case, then, indeed, the great power of testimonial compulsion, so necessary to the effective functioning of courts and legislatures, would be a nullity. We have often iterated the importance of this public duty, which every person within the jurisdiction of the government is bound to perform when properly summoned."

In *Blackmer v. United States*, 284 U.S. 421, 52 S.Ct. 252, 76 L.Ed. 375 (1932), the Court stated:

"It is also beyond controversy that one of the duties the citizen owes to his government is to support the administration of justice by attending its courts and giving his testimony whenever he is properly summoned."

As recently as 1974 the Court handed down its historic decision in *United States v. Nixon*, 418 U.S. 683, 94 S.Ct. 3090, 41 L.Ed.2d 1039, in which the Court affirmed the "ancient proposition of law" stated in *Blackmer, Bryan* and *Branzburg* "that 'the public has a right to every man's evidence,' except for those persons protected by a constitutional, common-law, or statutory privilege, * * *." The Court also stated:

"The need to develop all relevant facts in the adversary system is both fundamental and comprehensive. * * * The very integrity of the judicial system and public confidence in the system depend on full disclosure of all the facts, within the framework of the rules of evidence. To insure that justice is done, it is imperative to the function of courts that compulsory process be available for the production of evidence needed either by the prosecution or by the defense. * * * Whatever their origins, these exceptions to the demand for every man's evidence are not lightly created nor expansively construed, for they are in derogation of the search for truth."

Also in 1974 in *Pell v. Procunier*, 417 U.S. 817, 94 S.Ct. 2800, 41 L.Ed.2d 495 (1974), the Court said:

"The Court there [*Branzburg*] could 'perceive no basis for holding that the public

interest in law enforcement and in ensuring effective grand jury proceedings [was] insufficient to override the consequential, but uncertain, burden on news gathering that is said to result from insisting that reporters like other citizens, respond to relevant questions put to them in the course of a valid grand jury investigation or criminal trial.'" 417 U.S. at 833, 94 S.Ct. at 2809.

Therefore our reading of *Branzburg v. Hayes, supra,* is to the effect that no newsman's privilege against disclosure of confidential sources founded on the First Amendment exists in an absolute or qualified version. The only restrictions against compelled disclosure appear to be in those cases where it is demonstrably intended to unnecessarily harass members of the news media on a broad scale by means having an unnecessary impact on protected rights of speech, press or association.

The appellant commends to our attention the decisions of United States Courts of Appeals, *Baker v. F & F Investment,* 470 F.2d 778 (2d Cir. 1972) cert. denied, 411 U.S. 966, 93 S.Ct. 2147, 36 L.Ed.2d 686; and *Cervantes v. Time, Inc.,* 464 F.2d 986 (8th Cir. 1972) cert. denied, 409 U.S. 1125, 93 S.Ct. 939, 35 L.Ed.2d 257. We conclude that each may be distinguished from the present case in several respects. *Baker* involved an appeal from a trial court's interlocutory refusal to compel a journalist to disclose the identity of a source. On appeal the Court noted that the journalist was not a party to the underlying action and that there was no showing that the identity of the source was necessary to plaintiff's case. The Court there emphasized that a ruling on a discovery motion is discretionary and therefore would only be reviewed on a showing of abuse of discretion. Lastly and perhaps most importantly, although that action was in federal court, the laws of two states were relevant. The action was pending in the federal court for Illinois and the discovery motion was heard in the federal court for New York. Both Illinois and New York had enacted legislation protecting journalists from forced disclosure of their sources. N.Y. Civil Rights Law § 79–H (McKinney's 1976); Ch. 51 Ill.Rev.Stat. § 111 et seq. (1971).

*Cervantes* was a diversity case in the federal court brought for libel against a national magazine. The reporter who wrote the allegedly libelous material was deposed at pre-trial but refused to reveal the identity of confidential informants within the United States Department of Justice. Prior to the time of reaching the merits of the discovery motion, the trial court granted a motion for summary judgment. The Court on appeal concluded that the refusal to require disclosure was not reversible error and affirmed the lower court's summary judgment rendered against plaintiff. In passing, the Court in *Cervantes* acknowledged that the weight of decisional authority holds that newsmen do not have a First Amendment privilege to withhold news sources. 464 F.2d at 992. As was stated in *Dow Jones & Co., Inc. v. Superior Court,* 364 Mass. 317, 303 N.E.2d 847 (1973):

> "We refuse to extrapolate from the *Cervantes* decision a requirement that, because in libel actions under federal procedures it is possible to obtain a judgment on the merits before the discovery issue is ruled on, therefore in libel actions in our courts discovery of a newsman's sources cannot be ordered without a preliminary evaluation of the probable results on the merits." 303 N.E.2d at 851.

We move then to consideration of our own Constitution, Art. I, § 9, guaranteeing the freedom of speech and press. We do so in view of the language of *Branzburg* stating:

> "It goes without saying, of course, that we are powerless to bar state courts from responding in their own way and construing their own constitutions so as to recognize a newsman's privilege either qualified or absolute."

Art. I, § 9, of our Constitution provides:

> "Every person may freely speak, write and publish on all subjects, being responsible for the abuse of that liberty."

That provision of our Constitution has seldom been considered by this Court since *McDougall v. Sheridan*, 23 Idaho 191, 128 P. 954 (1913), which although of historical interest, is not relevant to the case at bar. None of our recent decisions in the area of freedom of press have construed our state constitutional provisions.

As herein stated, a statutory privilege against disclosure has been enacted in some jurisdictions. Those courts of our sister states who, at least at the time of their decision, did not have such a statutory privilege are somewhat divided as to judicial creation of the privilege. However, the majority have refused to create a court mandated privilege.

In *State v. Buchanan,* 250 Or. 244, 436 P.2d 729 (1968), the court commented on an asserted privilege against a newsman's disclosure of confidential sources:

"In the decisions dealing with reporter's asserted right to refuse to disclose his source of information, the courts have held that rights of privacy, freedom of association, and ethical convictions are subordinate to the duty of every citizen to testify in court.

"Indeed it would be difficult to rationalize a rule that would create special constitutional rights for those possessing credentials as news gatherers which would not conflict with the equal privileges and equal protection concepts also found in the constitution. Freedom of the press is a right which belongs to the public; it is not the private preserve of those who possess the implements of publishing * * *.

"Apart from the definitional difficulties in attempting to give constitutional status to a privilege for qualified news gatherers which presumably would be denied to less favored classes, there is another objection to discrimination between news gatherers and other persons. Such a practice would be potentially destructive of the very freedom that is sought to be preserved by this appeal. After the lessons of colonial times, the First Amendment required the federal government to resist the normal temptation of rulers to regulate, license or otherwise pass upon the credentials of those claiming to be authors and publishers. An invitation to the government to grant a special privilege to special class of 'news gatherers' necessarily draws after it an invitation to the government to define the membership of that class. We doubt that all news writers would want the government to pass on the qualifications of those seeking to enter their field * * *. "Assuming that legislators are free to experiment with such definitions, it would be dangerous business for courts, asserting constitutional grounds, to extend to an employee of a 'respectable' newspaper a privilege which would be denied to an employee of a disreputable newspaper; or to an episotic pamphleteer; or to a freelance writer seeking a story to sell on the open market; or, indeed, to a shaggy nonconformist who wishes only to write out his message and nail it to a tree. If the claimed privilege is to be found in the constitution, its benefits cannot be limited to those whose credentials, may, from time to time, satisfy the government." 436 P.2d at 731–732.

In 1961 in the matter of *In re Goodfader's Appeal,* 45 Haw. 317, 367 P.2d 472, the Hawaii Supreme Court stated:

"In this jurisdiction no statutory privilege against disclosure is extended to newsmen. Consistently with the foregoing general rule, therefore, no such privilege should be judicially recognized. However, it is stated that this is a vitally important case to the new state of Hawaii and as the issue presented is a matter of first impression, we are urged to pioneer in the field and take advantage of the 'opportunity to establish unequivocally that a right of a free press guaranteed by the constitution of our state shall be given as broad a scope as is necessary to insure a truly free press.' Also, it is said: 'To accomplish this objective confidential sources of information must be held to be immune from compulsory dis-

closure and appellant's silence a constitutionally protected right.' Although urged primarily from a constitutional standpoint, alternately it is argued that the same result is necessary from a modernistic public policy standpoint. What, in effect, is actually asked of us is to create an evidentiary privilege in favor of newsmen. We are not favorably disposed to the invitation."

*In re Pappas,* 358 Mass. 604, 266 N.E.2d 297 (1971), was one of the three cases reviewed by the U.S. Supreme Court in *Branzburg.* In *Branzburg* the *Pappas* decision was affirmed and characterized as stating the general law. In the *Pappas* opinion is substantial discussion relative to the asserted privilege of newsmen from disclosure of confidential sources and the cases and commentators of significance to the question.

In 1973 the Massachusetts court in *Dow Jones & Co., Inc v. Superior Court,* 364 Mass. 317, 303 N.E.2d 847, had for consideration the application of its holding in *Pappas* to a civil suit for libel the facts of which are substantially similar to those of the case at bar. Discussed and distinguished were *Baker v. F & F Investment, supra,* and *Cervantes v. Time, Inc., supra.* The court discussed its previous *Pappas* decision and the acceptance of its rationale by the United States Supreme Court in *Branzburg,* and then held that *Pappas* represented the correct view and should be extended to civil cases in the libel field.

While admittedly *United States v. Liddy,* 354 F.Supp. 208 (D.C.1972), was in the context of a criminal prosecution at trial, Judge Sirica observed therein:

"There can be little dispute that the common law recognized no privilege which would support a newspaper or reporter in refusing, upon proper demand, to disclose information received in confidence. Such a privilege, if it exists, must grow out of the first amendment free press guarantee. Quite appropriately, in this court's view, the Supreme Court has recognized as component parts of that guarantee the freedom to publish without prior governmental approval, a right of circulation, freedom to distribute literature, and the right to receive printed matter. And most recently with the Supreme Court's decision of Branzburg it may be said that a right to gather news has been explicitly acknowledged. While acknowledging this corollary right, however, the court rejected the claim that such a right implies a privilege to protect the identity of news sources. After citing numerous cases in which restrictions on the right to gather news have been sustained the court classified the requirement to answer subpoenas and disclose sources as another instance of permissible restriction. The majority noted that 'the evidence fails to demonstrate that there would be significant constriction of the flow of news to the public if this court reaffirms the prior common law and constitutional rule regarding the testimonial obligation of newsmen.' "

In *Carey v. Hume,* 160 U.S.App.D.C. 365, 492 F.2d 631 (1974) that court was faced with a factual pattern substantially similar to the case at bar. The action was one in libel and the newspaper story reflected that part of the information supplied therein was from an undisclosed source. In the course of the pre-trial discovery upon being asked for disclosure of those sources the information was denied on the basis of an asserted privilege founded in the First Amendment. That court reviewed *Branzburg, supra; Garland v. Torre, supra; Dow Jones & Co. v. Superior Court, supra.* The court stated:

"Even if he [plaintiff] did prove that the statements were false, Sullivan also requires a showing of malice or reckless disregard of truth. That further step might be achieved by proof that appellant [newsman] in fact had no reliable sources, that he misrepresented the reports of his sources, or the reliance upon those particular sources was reckless.

"Knowledge of the identity of the alleged sources would logically be an initial element in the proof of any such circumstances. Although it might be possible to

submit the question of malice to the jury simply on the basis of conflicting allegations of the parties, that procedure would seem to provide the plaintiff little prospect of success in view of his heavy burden of proof. Consequently, we find that the identity of appellant's sources is critical to appellee's claim.

\* \* \* \* \* \*

"What we have decided—and all that we have decided—is that the district court cannot, on the limited record before us, be said to have abused the discretion invested in it to grant or to deny a motion to compel discovery under Rule 37. We have rejected the only contention made to us by appellant, and that was the pre-Branzburg claim that there either is, or should be, an absolute First Amendment barrier to the compelled disclosure by a newsman of his confidential sources under any circumstances. That was not, in our view, the law before Branzburg, and it is certainly not the law after, in either civil or criminal proceedings."

There are to be sure cases wherein courts have differed from those cited above. *See, State v. Knops,* 49 Wis.2d 647, 183 N.W.2d 93 (1971); *Loadholtz v. Fields,* 389 F.Supp. 1299 (D.C.M.D.Fla.1975); *Brown v. Commonwealth,* 214 Va. 755, 204 S.E.2d 429 (1974); *State v. St. Peter,* 132 Vt. 266, 315 A.2d 254 (1974); *Morgan v. State,* 337 So.2d 951 (Fla.1976). However, at best those decisions discuss the privilege as being qualified.

Of somewhat marginal interest in the case at bar are those cases arising in jurisdictions wherein exist legislatively created statutory privilege. *See, Re Bridge,* 120 N.J.Super. 460, 295 A.2d 3 (1972). There the court followed *Branzburg* in refusing to create a First Amendment privilege and although the New Jersey evidence rule extends privilege to newspapermen to refuse to disclose the source of any information published in the newspaper, such only protects the source and not the information itself, cert. denied, *Bridge v. United States,* 410 U.S. 991, 93 S.Ct. 1500, 36 L.Ed.2d 189. *See also, Lightman v. State,* 15 Md.App. 713, 294 A.2d 149, aff'd, 266 Md. 550, 295 A.2d 212, cert. denied 411 U.S. 951, 93 S.Ct. 1922, 36 L.Ed.2d 414; *People v. Dan,* 41 A.D.2d 687, 342 N.Y.S.2d 731, appeal dismissed, 32 N.Y.2d 764, 344 N.Y.S.2d 955, 298 N.E.2d 118; *People v. Wolf,* 39 A.D.2d 864, 333 N.Y.S.2d 299. *See also Hestand v. State,* 257 Ind. 191, 273 N.E.2d 282 (1971).

One of the more recent developments in an adjunct area is the case of *Farr v. Pitchess,* 522 F.2d 464 (9th Cir. 1975). For earlier state court history see *Farr v. Superior Court,* 22 Cal.App.3d 60, 99 Cal.Rptr. 342, cert. denied, 409 U.S. 1011, 93 S.Ct. 430, 34 L.Ed.2d 305 and *Re Farr,* 36 Cal.App.3d 577, 111 Cal.Rptr. 649. In *Pitchess,* the Court stated:

"This appeal presents the no-longer novel question regarding the extent of protection afforded by the First Amendment 'free press' provision to a newspaper reporter who resists judicially ordered disclosure of his news sources. \* \* \* The Branzburg Court dealt precisely with the first amendment free press provision as it affected testimony sought to be produced before a grand jury. However, the opinion appears to teach [sic] broadly enough to be applied to other civil or criminal judicial proceedings as well. Recent cases have so held." [citing *Carey v. Hume, supra,* and *U. S. v. Liddy, supra.*]

Commentary in this relatively new field of *constitutionally* based privilege from disclosure is voluminous.[2] We have reviewed

---

2. *Pre-Branzburg:*

Guest & Stanzler, The Constitutional Argument for Newsmen Concealing Their Sources, 64 N.W.L.Rev. 18 (1969); Blasi, The Newsmen's Privilege: An Empirical Study, 70 Mich.L.Rev. 229 (1971); Nelson, The Newsmen's Privilege Against Disclosure of Confidential Sources and Information, 24 Vand.L.Rev. 667 (1971); Note, Reporters and Their Sources: The Constitutional Right to a Confidential Relationship, 80 Yale L.J. 317 (1970); Note: The Newsmen's Privilege: Government Investigations, Criminal Prosecutions and Private Litigation, 58 Cal.L. Rev. 1198 (1970).

them but as the tentmaker "came out by the same door where in [we] went" and no wiser. We are left to our own devices and what wisdom we may garner from authorities which may be persuasive although not binding.

We find agreement with the reasoning and rationale contained in the opinions of the Massachusetts and Oregon courts. We are also persuaded that the United States Supreme Court would, if presented the opportunity, uphold the view of the Massachusetts court as it has once already in *Pappas*.

The underlying rationale of the First Amendment protection of freedom of the press is clear. In a society so organized as ours, the public must know the truth in order to make value judgments, not the least of which regard its government and officialdom. The only reliable source of that truth is a "press" (which is to say everyone—pamphleteers, nonconformists, undergrounders) which is free to publish that truth without government censorship. We cannot accept the premise that the public's right to know the truth is somehow enhanced by prohibiting the disclosure of truth in the courts of the public.

The order, judgment and sentence of the trial court are affirmed.

McFADDEN, C. J., and SCOGGIN, District Judge (Ret.), concur.

DONALDSON, Justice, dissenting.

In every case involving an infringement of first amendment rights, whether the infringement is direct or indirect, one question is paramount. A court must decide whether there is a compelling interest justifying the infringement. Every first amendment case necessarily involves a balancing of competing interests. The interest in maintaining a robust first amendment must be balanced against whatever interest is asserted as justifying the impairment of first amendment freedoms. The balance is weighted in favor of the first amendment, however, in that the competing interest must be "compelling" or "paramount." And normally the burden of establishing a compelling interest is on the state. These principles have been given consistent endorsement by the United States Supreme Court. *DeGregory v. Attorney General of New Hampshire*, 383 U.S. 825, 86 S.Ct. 1148, 16 L.Ed.2d 292 (1966); *NAACP v. Button*, 371 U.S. 415, 83 S.Ct. 328, 9 L.Ed.2d 405 (1963); *Bates v. Little Rock*, 361 U.S. 516, 80 S.Ct. 412, 4 L.Ed.2d 480 (1960); *NAACP v. Alabama*, 357 U.S. 449, 78 S.Ct. 1163, 2 L.Ed.2d 1488 (1958); *Thomas v. Collins*, 323 U.S. 516, 65 S.Ct. 315, 89 L.Ed. 430 (1945); *Schneider v. State*, 308 U.S. 147, 60 S.Ct. 146, 84 L.Ed. 155 (1939). Because the majority diverges from this well-established approach, I dissent.

The majority opinion does not expressly address the issue of competing interests. In fact, there is some doubt that the majority believes first amendment freedoms are even implicated. Two interests are implicated, however,—the interest in allowing the press unfettered access to sources of information and the interest in allowing courts unimpaired access to testimony *in civil litigation*. These interests are in conflict and they have to be balanced. The case cannot be resolved simply by stating the general theory that new testimonial privileges are disfavored or by stating the

*Post-Branzburg:*
Note, 51 N.Caro.L.Rev. 562; Comment, A Need for Statutory Protection of News Sources, 61 Ky.L.J. 551; Comment, Journalists & Their Sources, 58 Iowa L.Rev. 618; Note, 18 Villanova L.Rev. 288; Note, 41 Fordham L.Rev. 1024; Comment, Newsman's Privilege, 25 U.Fla.L. Rev. 381; Comment, Newsman's Privilege Statutes, 49 Notre Dame Lawyer 150; Comment, Ervin, In Pursuit of a Press Privilege, 11 Harv.J. on Legis. 233; Comment, The Journalist's Prerogative of Non-Disclosure, 20 Loyola L.Rev. 120; Comment, Subpoenas to Compel Disclosure of Confidential Information, 49 Los Angeles Bar Bull. 133; Comment, Journalists in the Courts, 8 U.San Francisco L.Rev. 644; Note, 9 U.Richmond L.Rev. 171; Note, Newsman's Source Privilege, 26 U.Fla.L.Rev. 453; Note, Dixon, Newsman's Privilege by Federal Legislation, 1 Hastings Const.Law Q. 39; Note, 53 Bost.U.L.Rev. 497; Note, Newsman's Privilege Two Years After Branzburg, 49 Tulane L.Rev. 417; Note, Grodde, The Developing Qualified Privilege for Newsmen, 26 Hastings L.J. 709; Note, 16 Santa Clara L.Rev. 379; Note, Murphy, Journalist's Privilege, 15 Texas L.Rev. 829.

importance courts have traditionally placed on compelling testimony in a lawsuit.

Nor can the case be resolved on the basis of *Branzburg.* The majority acknowledges that *Branzburg* was decided in the context of criminal prosecution.[1] But, not surprisingly, given the approach of the majority opinion, it misses the import of this distinction. The immediate question before us is whether the admittedly important interest in compelling disclosure of relevant information in civil litigation should take precedence over the first amendment. In resolving this question, the authority that is most relevant is that which was decided in a civil context. *Branzburg* is a logical starting point, but it is only that.

*Branzburg.*

*Branzburg* was a 5–4 decision in which Justice Powell wrote a concurring opinion. The four dissenters maintained that newsmen should enjoy either a qualified or absolute privilege.[2] The plurality opinion authored by Justice White rejected both claims, but it *did* recognize that newsgathering is entitled to first amendment protection.

Early in his decision, Justice White states "Nor is it suggested that news gathering does not qualify for First Amendment protection; without some protection for seeking out the news, freedom of the press could be eviscerated." *Branzburg v. Hayes, supra* at 681, 92 S.Ct. at 2656. At the end of his opinion he states, "Finally as we have earlier indicated, news gathering is not

without its First Amendment protections and grand jury investigations if instituted or conducted other than in good faith, would pose wholly different issues for resolution under the First Amendment." 408 U.S. at 707, 92 S.Ct. at 2670.

To be sure, the protection that Justice White would allow the first amendment is narrowly circumscribed. The opinion as a whole seems to indicate that first amendment protection would only exist when the newsgatherer could show that the grand jury proceedings were being used as a means of harassment. In addition, the burden of proving lack of good faith appears to be on the newsgatherer which is contrary to the traditional approach in first amendment cases. But what is significant is that Justice White reached this result by balancing the burden disclosure would place on newsgathering against the importance of disclosure to the criminal justice system. Justice White found the latter compelling. 408 U.S. at 690, 92 S.Ct. 2646. The question in the present case is whether the interest in civil litigation is equally compelling.

It should also be noted that commentators and courts have not found *Branzburg* conclusive even in regard to the balance that should be struck between the first amendment and the needs of the criminal justice system. *Bursey v. United States,* 466 F.2d 1059 (9th Cir. 1972); *State v. St. Peter,* 132 Vt. 266, 315 A.2d 254 (1974); *Brown v. Commonwealth,* 214 Va. 755, 204 S.E.2d 429 (1974). Note, Goodale, *Branz-*

1. The Supreme Court specifically limited its holding in *Branzburg:* "The sole issue before is us the obligation of reporters to respond to grand jury subpoenas as other citizens do and to answer questions relevant to an investigation into the commission of crime." *Branzburg v. Hayes,* 408 U.S. 665, 682, 92 S.Ct. 2646, 2657, 33 L.Ed.2d 626.

   An exact reading of the issues raised in the *Branzburg* trilogy further limits the Court's holding. The Court was presented with two issues, a reporter's appearance before a grand jury and his testimony to crimes *that he actually witnessed.*

2. In an opinion authored by Justice Stewart, three of the dissenters adopted a qualified privilege.

"[T]he government must (1) show that there is probable cause to believe that the newsman has information that is clearly relevant to a specific probable violation of law; (2) demonstrate that the information sought cannot be obtained by alternative means less destructive of First Amendment rights; and (3) demonstrate a compelling and overriding interest in the information." 408 U.S. at 743, 92 S.Ct. at 2681. (Stewart, Brennan and Marshall, JJ., dissenting)

Justice Douglas in a separate dissent stated that the first amendment demanded that reporters enjoy an absolute privilege. 408 U.S. at 712, 92 S.Ct. at 2686, 33 L.Ed.2d at 657. (Douglas, J., dissenting)

*burg v. Hayes* and the Developing Qualified Privilege for Newsmen, 26 Hastings L.J. 709 (1975); Comment, Right of the Press to Gather Information after *Branzburg* and *Pell*, 124 U.Penn.L.Rev. 166 (1975); Supreme Court, 1971 Term, 86 Harv.L.Rev. 52, 137–48 (1972).

The seeds of disputation were sown in Justice Powell's concurring opinion. Justice Powell, although he was the fifth justice to join the *Branzburg* majority, allows the first amendment greater weight than the plurality opinion does. First of all, Justice Powell does not impose a burden of proof on either the newsgatherer or the government. Instead he maintains that:

> "the court—when called upon to protect a newsman from improper or prejudicial questioning—would be free to balance the competing interests on their merits in the particular case." 408 U.S. at 710 n. *, 92 S.Ct. at 2671.

Secondly, Justice Powell expanded the scope of a newsgatherer's first amendment protection. In addition to being protected from grand jury proceedings conducted in bad faith, Justice Powell thought that a newsgatherer might seek a motion to quash or a protective order whenever he was

> "called upon to give information bearing only a remote and tenuous relationship to the subject of the investigation, or if he has some other reason to believe his testimony implicates confidential source relationships, without a legitimate need of law enforcement." 408 U.S. at 710, 92 S.Ct. at 2671.

A majority of this Court contends that Powell's concurrence gives a newsgatherer immunity from disclosure only if a grand jury investigation is conducted in bad faith. Whatever the meaning of Powell's concurrence—and some commentators and courts contend that it establishes a qualified privilege—it cannot be read as the majority reads it. If Justice Powell intended that when an "investigation is not being conducted in good faith [the newsman] is not without remedy," there would have been no reason for him to write a special concurrence. Justice White's plurality opinion

conceded that much to the first amendment. The majority's interpretation bears no relation to the language of the opinion itself. Justice Powell explicitly stated that he did not think disclosure would be justified in a case when the requested information was "remote or tenuous to the subject of the investigation." 408 U.S. at 710, 92 S.Ct. at 2671.

Admittedly the opinion is opaque, but since Powell was the deciding vote, it cannot be cavalierly dismissed—especially in view of the pains to which Powell went in *Saxbe v. Washington Post Co.*, 417 U.S. 843, 94 S.Ct. 2811, 41 L.Ed.2d 514 (1974) to point out that his opinion in *Branzburg* was extremely limited.

> "I emphasized the limited nature of the *Branzburg* holding in my concurring opinion. 'The Court does not hold that newsmen, subpoenaed to testify before a grand jury, are without constitutional rights with respect to the gathering of news or the safeguarding of their sources.' In addition to these explicit statements, a fair reading of the majority's analysis in *Branzburg* makes plain that the result hinged on an assessment of the competing societal interests involved in that case rather than on any determination that First Amendment rights are not implicated." 417 U.S. at 859–860, 94 S.Ct. at 2819.

Justice Powell's concurrence has had important consequences in the application of *Branzburg*. In *Bursey v. United States*, *supra*, for example, the Court of Appeals for the Ninth Circuit deviated from the conclusion reached by the *Branzburg* plurality. In response to the government's contention that the first amendment is of no weight in grand jury proceedings, the court said:

> "No governmental door can be closed against the amendment. No governmental activity is immune from its force. That the setting for the competition between rights secured by the first amendment and antagonistic governmental interests in a grand jury proceeding is simply one of the factors that must be taken

into account in striking the appropriate constitutional balance." 466 F.2d at 1082. The court struck the balance in favor of the first amendment. The burden was on the government to establish that the

> "government's interest in the subject matter of the investigation is 'immediate, substantial, and subordinating,' that there is a 'substantial connection' between information it seeks to have the witness compelled to supply and the overriding governmental interest in the subject matter of the investigation, and that the means of obtaining information is not more drastic than necessary to forward the asserted governmental interest." 466 F.2d at 1083.

In short, the court accorded newsgathering a qualified privilege.

The newspaper reporters in *Bursey* had refused to answer 56 of the grand jury's questions. The court required them to answer only those questions that fell under the above standard. To that end the court distinguished between those questions regarding direct witnessing of possible criminal activity and those relating to newsgathering activities, even though the latter "might have something vaguely to do with conduct that might have criminal consequences." The newspapermen were required only to answer questions about criminal activity that they witnessed.

Although the *Bursey* decision was technically decided and released the day following *Branzburg*, the opinion was undoubtedly written before it. Accordingly, the government moved for a rehearing arguing that the *Bursey* holding was inconsistent with *Branzburg*. Maintaining that the *Branzburg* holding was limited to its facts, the Ninth Circuit denied the government's motion. The court noted that it adhered to the *Branzburg* formulation that the government or a grand jury did not have to make a preliminary showing before the grand jury could ask questions of witnesses. Nor did *Bursey* permit a grand jury witness to refuse to identify a person whom he had seen committing a crime. Nothing in *Branzburg*, moreover, "purported to disavow the balancing standards" traditionally used in first amendment cases. Competing interests were balanced in *Bursey* and the balance was struck in favor of the first amendment. The court concluded:

> "We have reexamined our analysis of the factors involved in balancing the First Amendment rights against the governmental interests asserted to justify compelling answers to the questions here involved, and we have concluded that the balance we struck is not impaired by *Branzburg*." 466 F.2d at 1091.

Special emphasis was placed on Justice Powell's concurring opinion. The court followed Powell's prescription that the "balance of these vital constitutional societal interests on a case-by-case basis accords with the tried and traditional way of adjudicating such questions." *Branzburg v. Hayes, supra,* 408 U.S. at 710, 92 S.Ct. at 2671.

For the purposes of this case it is unnecessary to attempt a clarification of the *Branzburg* decision.[3] The ultimate mean-

---

3. I will only state parenthetically that I believe that Powell's concurrence does establish a qualified privilege. He explicitly states that under certain circumstances he would not force disclosure of sources. In other words, sources are privileged under certain circumstances.

Whether Powell adopts the standards articulated in Stewart's dissent—relevance, exhaustion of alternate sources and compelling national interest in the testimony—is ambiguous. He accepts the relevance standard—he would quash a subpoena that requires a reporter to yield information "bearing only a remote and tenuous relationship to the subject of the investigation." 408 U.S. at 710, n. *, 92 S.Ct. at

2671. He adds in the same footnote, however, that Stewart's proposal "would impose as heavy burdens of proof to be carried by the State." This statement can be interpreted in two ways. He intended either that the remainder of the Stewart test should fail because it was too burdensome, or that the burden of proof should be placed on the reporter rather than the state.

What is important is that Powell's opinion does allow a qualified privilege. The majority of this Court is therefore in error when it states that *Branzburg* does not privilege newsgathering. Five Justices, Powell and the four dissenters, do adopt a qualified privilege.

ing of the case will have to be determined by subsequent case law. It will suffice to say that *Branzburg* has not been given in a criminal context the weight that a majority of this Court gives it in a civil context.

### The civil cases.

We come now to those cases that are most relevant to the outcome of this case—cases in which newsmen have been subpoenaed to testify in civil litigation. The first case decided in this area was *Garland v. Torre*, 259 F.2d 545 (2d Cir. 1958). The case arose when actress Judy Garland was described by Marie Torre in her Herald Tribune column as overweight. Torre attributed the statement to an unnamed C.B.S. official. Garland sued C.B.S. and sought the identity of the person who had made the statement. After having deposed several officials at C.B.S., Garland sought to depose Torre. Torre refused to identify the source and as a consequence she was held in criminal contempt. After balancing the interests involved, the Court of Appeals for the Second Circuit found that the identity of the source was crucial to the plaintiff's case and compelled disclosure.

What is significant for the purposes of this case, however, is that Justice Stewart was careful to point out the qualified nature of the required disclosure.

> "It is to be noted that we are not dealing here with the use of the judicial process to force a wholesale disclosure of a newspaper's confidential sources of news, nor with a case where the identity of the news source is of doubtful relevance or materiality [citations omitted]. The question asked of the appellant went to the heart of the plaintiff's claim." 259 F.2d at 549–50.

The majority reads *Garland* incorrectly when it maintains that *Garland* does not establish a qualified privilege. The test applied by the court in *Garland* is very similar to the one Justice Stewart articulat-

ed in his *Branzburg* dissent. The *Garland* test demands (1) relevancy, (2) exhaustion of alternate sources and (3) that the requested information be of critical importance. A plaintiff is entitled to disclosure only if he satisfies all three requirements. Otherwise, the identity of a reporter's source is privileged.

The majority also incorrectly analogizes the facts of *Garland* to the facts of the present case. *Garland* is similar to *Caldero* in that a reporter refused to disclose the source of an allegedly defamatory statement. The similarity ends there. The identity of the source was arguably crucial in *Garland* because unless he was in fact a C.B.S. official, an action would not lie against C.B.S. Garland sued C.B.S. not the newspaper that published the statement. The only relevance that the identity of the source has in *Caldero* is that an inference of malice would arise if the source did not exist or if the source was manifestly irresponsible. I do not believe that such would normally qualify under the *Garland* test as the heart of the plaintiff's case unless the plaintiff's claim already has some foundation without the identity of the source being known.

It also is important to note that *Garland* was decided before the monumental Supreme Court decision in *New York Times Co. v. Sullivan*, 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964).[4] The balancing process in *Garland* was based upon a common law premise that the interest of the reporter in protecting a source is a *private* one, which must yield to the superior public interest in the administration of justice. That premise was refuted by *New York Times*. Torre's claim for a constitutional justification for nondisclosure of her source was undermined by the fact that defamatory statements were considered outside the scope of first amendment protection. Had *Torre* been decided after *New York Times*, the result would have been different. Since *New*

---

4. Prior to *Sullivan*, there had been only occasional mention in defamation cases of the first amendment guarantees of free speech and free press. *Sullivan* introduced somewhat of a "bombshell" by holding that the first amendment itself required the privilege. Prosser, Law of Torts § 118 (1971).

*York Times*, defamatory statements have been within the ambit of the first amendment. The thrust of *New York Times* and its progeny is that the elements to be weighed in the balancing process in constitutional libel actions should be the *public* interest in the free flow of news and the plaintiff's *private* reputational interest. The real import of *Garland* is not, as the majority seems to think, that the court ordered disclosure of a confidential source. *Garland's* import is that although the statements involved were outside constitutional protection, the Second Circuit gave credence to the claimed privilege to protect a confidential source by insisting upon a strong showing of relevance prior to disclosure.

Civil cases decided since *Garland* have followed *Garland* in adopting a qualified privilege for newsgathering. *Carey v. Hume*, 160 U.S.App.D.C. 365, 492 F.2d 631 (1974); *Cervantes v. Time, Inc.*, 464 F.2d 986 (8th Cir. 1972); *Baker v. F & F Investment*, 470 F.2d 778 (2d Cir. 1972).

*Carey v. Hume, supra*, involved an interlocutory appeal from a district court order directing a reporter to disclose his confidential sources. The Court of Appeals for the District of Columbia Circuit announced at the outset that the *Garland* approach should govern the outcome of the case. The court described the *Garland* approach as follows:

"That approach essentially is that the court will look to the facts on a case-by-case basis in the course of weighing the need for the testimony in question against the claims of the newsman that the public's right to know is impaired." 492 F.2d at 636.

The *Carey* court ordered disclosure, but it was careful to limit its holding to the specific facts of *Carey*. Jack Anderson had written a column stating that the United Mine Workers general counsel Edward L. Carey and U.M.W. President Tony Boyle had been seen improperly taking records from Boyle's office. Carey sued for libel and deposed Britt Hume, Anderson's colleague, who had supplied information for the article. Hume stated that a U.M.W. employee was the source for the statement, but declined to identify him.

The court found that the identity of Hume's source was critical to Carey's case. Hume testified that, according to his source, Carey and Boyle had confiscated the records over a protracted period of time. The court noted that it would be exceedingly difficult for Carey to introduce evidence beyond his own testimony that would prove that he did not "at any time of day or night over an indefinite period of several weeks" remove the documents from U.M.W. offices. 492 F.2d at 637. In addition, Anderson had based the allegedly defamatory article exclusively on the information supplied by the undisclosed source. There were no corroborative sources. Lastly and most importantly, the record before the court indicated that Carey's claim was not frivolous.[5] Whether Carey would prevail hinged upon the identity of the source.[6]

In *Cervantes v. Time, Inc., supra*, the issue of disclosure had to be resolved in a procedural context different from *Carey*, but the underlying issue was the same— should the court compel disclosure. Life Magazine had published an article representing that Alfonso Cervantes, the Mayor

[5.] The court stated, "In *Garland* the court was unable to say that the plaintiff's claim was frivolous. Neither can we conclude on the basis of the record before us that appellee's claim is without merit." 492 F.2d at 637.

[6.] The court relaxed the requirement of *Garland* that a plaintiff exhaust alternate sources to uncover the identity of the undisclosed source before seeking disclosure from the reporter. In *Carey* any one of a multitude of U.M.W. employees could have provided the information on which Anderson based his article. The court concluded that it would be unreasonable to expect the plaintiff to interview all the employees of U.M.W. to discover the source of Hume's information. 492 F.2d at 638. However, to require Caldero to interview police experts in Idaho before he could compel disclosure would appear to be feasible, absent a showing that an attempt was made, and that it proved impossible. In this case no such showing was made. I believe that *Garland* requires only that a plaintiff exhaust alternate sources when it is feasible to do so.

of St. Louis, maintained business and social ties with organized crime. Cervantes sued and moved for an order to compel disclosure of the source of the article. Time, Inc. made a motion for summary judgment with accompanying affidavits refuting Cervantes' claim of malice. The district court granted Time's motion without reaching the merits of Cervantes' motion. Cervantes appealed. The Eighth Circuit found that in view of the plaintiff's burden under the *New York Times* malice standard, there was no reasonable probability that Cervantes would succeed in his libel suit. It therefore upheld the district court's grant of summary judgment even though the identity of Life's sources had not been revealed to Cervantes. The court's decision was based on the first amendment—"to routinely grant motions seeking compulsory disclosure of anonymous news sources without first inquiring into the substance of the libel allegation would utterly emasculate the fundamental principles that underlay the line of cases articulating the constitutional restrictions to be engrafted upon the enforcement of State libel laws." 464 F.2d at 993.

The majority is correct in noting that in *Cervantes* the Eighth Circuit affirmed the district court's grant of summary judgment against the plaintiff. It is incorrect in dismissing the import of the case for this reason. Cervantes' major argument was that the district court erred in granting summary judgment without first mandating the disclosure of Life's confidential sources. The Eighth Circuit had to decide, in effect, whether the first amendment took primacy over the plaintiff's right to know the identity of Life's sources. Were it not for the intervention of the first amendment, Cervantes' claim would have had merit. The Eighth Circuit's conclusion— that disclosure should be ordered only when "there is a concrete demonstration that the identity of defense news sources will lead to

persuasive evidence on the issue of malice" —is clearly relevant to the present case. 464 F.2d at 994. Expressed otherwise, *Cervantes* holds that the interest in compelling testimony takes precedence over the first amendment only when the information sought via disclosure is of critical importance to the plaintiff's case. The identity of a reporter's sources is privileged—if a plaintiff does not meet this standard, the court will not compel disclosure. This is merely a rephrasing of the *Garland* test that the requested information must go to the "heart of the plaintiff's claim."

The majority also errs when it dismisses the precedential value of *Baker v. F & F Investment, supra.*[7] A number of distinctions are cited by the majority, none of which refute the relevance of *Baker* to the present case. *Baker* came before the court as an interlocutory appeal from a district judge's decision refusing to compel a journalist to disclose confidential news sources. The district court reached its decision by balancing the public interest in a robust first amendment against the private interest in compelled testimony. The court concluded that the first amendment should prevail. On appeal the Court of Appeals saw the issue and its resolution as follows:

> "Appellants urge us to extend to this civil case the limited principle of *Branzburg v. Hayes* which held only that newsmen could be required to disclose confidential sources to a grand jury conducting a criminal investigation. We decline that invitation and affirm the order." 470 F.2d at 779–80.

The court followed the approach of *Garland.* In upholding the district court's decision it noted that (1) the plaintiff had not exhausted alternate sources, (2) he had not demonstrated relevance, and (3) he had not shown that the information was of critical importance. The contrary result reached in *Garland* was distinguished on the facts of the case:

---

7. *Baker* was a civil rights class action brought in behalf of all Negroes in the City of Chicago who purchased homes from approximately 60 named defendants between 1952 and 1969. During discovery, plaintiffs deposed a journal-ist who had written an article on racially discriminatory real estate practices in the Chicago area. Plaintiffs wanted to know the identity of the real estate agent who provided information for the story.

"The facts in the *Garland* case are wholly unlike those before us. There the record revealed that Miss Garland had taken active steps independently to determine the identity of the confidential news source. Three C.B.S. executives were deposed; they denied making the statement in question and denied knowing the identity of the network executive referred to in the Herald Tribune column. In view of these denials, the identity of Miss Torre's source became essential to the libel action: in the words of this Court, it 'went to the heart of plaintiff's claim.' [citation deleted] Appellants in this case have not demonstrated that the identity of [the reporter's] confidential source is necessary much less critical to the maintenance of their civil rights action." 470 F.2d at 784.

The basic theme of *Garland, Carey, Cervantes,* and *Baker* is that newsgathering should enjoy a qualified privilege.[8] The respective courts reached this result by engaging the traditional first amendment balancing test. The courts set off the public interest in a robust first amendment against the private interest in compelled testimony. Equilibrium was reached by allowing a qualified privilege—courts would compel disclosure only when the plaintiff could show that the identity of the source was critical to his case. There were variations from court to court (*Garland* and *Baker* would require exhaustion of alternate sources), but each of the courts used this standard to delineate the limits of the privilege.

Whether a court should require disclosure in the individual case will depend upon the facts of the case. Disclosure can not be dictated in the abstract. The issue must be resolved on a case-by-case basis—in the words of Justice Powell, the "tried and traditional way of adjudicating such ques-

tions." *Branzburg v. Hayes, supra,* 408 U.S. at 710, 92 S.Ct. at 2671.

When these principles are applied to the present case, we find that the identity of the confidential source is privileged. Caldero has not even come close to establishing the critical importance of Shelledy's testimony.[9] Shelledy's undisclosed source merely expressed an opinion about the professional propriety of Caldero's conduct that was echoed by the county prosecutor and the state attorney general, both of whom were identified in Shelledy's article. Furthermore, the uncontradicted deposition of the attorney general, who was Caldero's superior, confirmed the statements made in the news article. The statements themselves do not evince any inference of malice. Actual malice would have to be proved since the district court had already ruled that Caldero was a public official. Caldero's claim, moreover, is not supported by any other evidence. As was stated earlier, the only relevance that the identity of the source has in *Caldero* is that an inference of malice would arise if the source was either nonexistent or irresponsible. Critical importance cannot be established on such a meager basis. The identity of a source could be of critical importance only if plaintiff's allegations already had some basis in fact before disclosure. Then the identity of the reporter's source could have the pivotal importance envisioned by *Garland* and its progeny.

BAKES, Justice, dissenting:

I disagree with the majority that this newsman must be compelled to reveal the identity of the undisclosed "police expert" quoted in his news story. I agree with Justice Donaldson that the First Amendment to the United States Constitution affords a newsman a limited privilege against disclosure of his news sources in some cases.

8. In the related area of subpoenas duces tecum, courts have also given newsgathering a qualified privilege. *Democratic National Committee v. McCord,* 356 F.Supp. 1394 (D.C.D.C. 1973); *Spiva v. Francouer,* 39 Fla.Supp. 49 (Dade County Jud. Cir. 1973). Both cases quashed the subpoenas.

9. Caldero also has made no showing that he attempted to obtain the identity of Shelledy's source by alternative means less destructive of first amendment freedoms.

However, assuming that the article was false and defamatory, I disagree with Justice Donaldson that the claim of constitutional privilege in this case would have outweighed the importance of discovery of the police expert because in my opinion this information would have been critical to the issue of malice. But since I do not believe that this article was false and defamatory of Caldero, I conclude that the First Amendment interests in a free press outweigh the discovery of this information.

I

First, I cannot agree with the majority that the First Amendment guarantee of a free press does not afford a limited privilege to newsmen protecting them from discovery of their sources. An examination of the United States Supreme Court's opinions in *Branzburg* and the many intermediate court cases in this area reveals that even where discovery is ultimately ordered, it is only after application of a balancing of First Amendment interests in a free press against the right of litigants to discovery of material information, and then narrowly prescribing the questions which must be answered. This approach of the courts is thoroughly analyzed by Justice Donaldson in his dissent.

I believe the most telling indication that a limited privilege does exist in these news source discovery cases is disclosed by a comparison of the approach taken by the courts in these cases with the general rule of discovery laid out in I.R.C.P. 26(b)(1), which is identical to the comparable federal rule:

"RULE 26(b)(1). Scope of discovery in general.—Unless otherwise limited by order of the court in accordance with these rules, the scope of discovery is as follows: (1) *Parties may obtain discovery regarding any matter, not privileged, which is relevant to the subject matter involved* in the pending action, whether it relates to the claim or defense of the party seeking discovery or to the claim or defense of any other party, including the existence, description, nature, custody, condition and location of any books, documents, or other tangible things and the identity and location of persons having knowledge of any discoverable matter. *It is not ground for objection that the information sought will be inadmissible at the trial if the information sought appears reasonably calculated to lead to the discovery of admissible evidence.*" (Emphasis added).

This rule has consistently been interpreted to allow the broadest possible discovery; in *Hickman v. Taylor*, 329 U.S. 495, 67 S.Ct. 385, 91 L.Ed. 451 (1947), a case in which the U.S. Supreme Court discussed the scope of discovery under this rule, that Court observed:

"No longer can the time-honored cry of 'fishing expedition' serve to preclude a party from inquiring into the facts underlying his opponent's case." 329 U.S. at 507, 67 S.Ct. at 392.

The only limitation on discovery of unprivileged material is that it be relevant to the subject matter of the litigation, which is such a broad standard that at the discovery stage a party may in fact engage in a fishing expedition. 8 Wright & Miller, Federal Prac. & Proc., § 2008.

If there is no limited newsman's privilege, how can the following passage from *Garland v. Torre*, 259 F.2d 545 (2d Cir. 1958), be reconciled with the broad discovery rules outlined above?

"It is to be noted that we are not dealing here with the use of the judicial process to force a wholesale disclosure of a newspaper's confidential sources of news, nor with a case where the identity of the news source is of doubtful relevance or materiality. [Citations omitted]. The question asked of the appellant went to the heart of the plaintiff's claim. We hold that the Constitution conferred no right to refuse an answer." 259 F.2d at 549–550.

The "heart of the claim" test was also adopted in *Carey v. Hume*, 160 U.S.App. D.C. 365, 492 F.2d 631 (1974), wherein that Court observed:

". . . *Branzburg,* in language if not in holding, left intact, insofar as civil litigation is concerned, the approach tak-

en in *Garland.* That approach essentially is that the court will look to the facts on a case-by-case basis in the course of weighing the need for the testimony in question against the claims of the newsman that the public's right to know is impaired." 492 F.2d at 636.

Clearly, that court recognized that a limited privilege existed. Its holding that the newsman could be compelled to reveal his sources was arrived at by the balancing process it describes, which is a far contrast from the broad discovery provisions of Rule 26(b)(1).

In *Baker v. F & F Investment,* 470 F.2d 778 (2d Cir. 1972), the Second Circuit upheld the trial court's refusal to compel disclosure of a newsman's sources because it found no "concern [in this case] so compelling as to override the precious rights of freedom of speech and the press." 470 F.2d at 785. Again, the court was recognizing a limited privilege and so refused to allow broad discovery as provided by Rule 26(b)(1).

In this case, even while the trial court and the majority of this Court have held that the reporter here was not privileged to refuse to disclose his sources, the scope of the discovery ordered is limited to three questions, *ante* at 792, and the trial court rejected the plaintiff's request for discovery of answers to several collateral questions. But if "no newsman's privilege against disclosure of confidential sources founded on the First Amendment exists in an absolute or qualified version," as the majority states, *ante* at 797, there should be no reason why the plaintiff in this case is not afforded the right to broad discovery given all parties in civil litigation under Rule 26(b)(1)— in short, a fishing expedition. This very inconsistency in the trial court's limiting order and the majority's holding reveals that they have also done some balancing between the First Amendment right of free press and the right of litigants to information.

I agree with Justice Donaldson that the First Amendment to the United States Constitution affords a limited privilege against disclosure of sources in cases where such disclosure is not critical to an issue in the case. This limited privilege protects a newsman from broad discovery of his sources under Rule 26(b)(1). But he may be compelled to disclose certain information if a court concludes that a party's interest in obtaining that information outweighs the newsman's limited First Amendment privilege.

I disagree with Justice Donaldson, however, in his conclusion that discovery of the police expert would not have been critical in this case if this were a true case of defamation. However, because I do not believe that the article in question is defamatory of Caldero, I conclude that it would serve no purpose to allow discovery of the police expert and that in this case the interest in discovery is outweighed by the newsman's First Amendment privilege.

## II

The newspaper article that is the subject of this litigation covered a full page of the November 23, 1973, edition of the Lewiston Morning Tribune. The headline read, " 'You shot me . . . you really shot me!' Young father gunned down by state narc in Coeur d'Alene park when he panics after friend accosted by 'hippies.' " The article describes the facts leading up to the narcotics transaction and the shooting of the victim Johnson, mostly from Johnson's perspective. The article quotes Johnson extensively, and also quotes the prosecuting attorney of Kootenai County, the then Attorney General, a witness of the incident, Johnson's attorney, and the unidentified police expert. The tone of the article is sympathetic toward the victim Johnson, who subsequently pleaded guilty to a charge of possession with intent to sell, and is generally critical of the manner in which the incident was handled by Caldero. The passage quoting the police expert supported this generally critical tone.

In his complaint filed against the Tribune Company, Caldero alleged that the article "was an unfair, false and malicious account of the shooting incident which involved the plaintiff on August 27, 1972, and as such

the publication was not privileged by the defendant but was a libelous and defamatory publication on the part of the defendant." His affidavit filed in support of plaintiff's motion to compel discovery merely alleged that "such questions are material and relevant to the issues herein, and answers thereto should be required." In his deposition, Caldero was asked by the defendant to identify those passages of the article which he contended were false and libelous. Caldero went through the article, paragraph by paragraph, contending that certain statements were factually inaccurate, or that he disagreed with Johnson's version of the facts, or that the Attorney General and the prosecuting attorney had not made certain statements that were attributed to them in the article. None of these accusations of themselves could be considered defamatory. Concerning the passage at issue in this case, Caldero contended that the expert's opinion was speculative, and that he did not believe that such a police expert existed. He contended that this opinion made it appear that he, Caldero, had lied in his version of the facts, but he did not disagree with any of the factual assertions underlying the opinion of the police expert.

Caldero's deposition concludes with the following colloquy between Caldero and his counsel:

"Q. Mr. Caldero, in response to counsel's question as to the specific untrue parts of the article, can you state that any of those things taken by themselves are libelous to you, in and of themselves as picked apart by counsel?

"A. Very few of them sir, would in themselves mean much.

"Q. All right.

"A. But all lumped together they would mean a great deal.

"Q. You have alleged in your complaint that the article was an unfair, false and malicious account of the incident. Is that the article taken as a whole?

"A. Yes sir." Clk.Tr., p. 105.

The trial court had ruled that Caldero was a public official and therefore in order to prevail in this defamation action he is bound by the rule of *New York Times Co. v. Sullivan,* 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964), that "prohibits a public official from recovering damages for a defamatory falsehood relating to his official conduct unless he proves that the statement was made with 'actual malice'—that is, with knowledge that it was false or with reckless disregard of whether it was false or not." 376 U.S. at 279–280, 84 S.Ct. at 726. While the *New York Times* case became a landmark for its articulation of the actual malice standard in defamation cases, the actual holding in that case went further and the Supreme Court ruled that the publication in that case could not constitutionally be said to be defamatory of the plaintiff because the publication could not reasonably be interpreted as referring to the plaintiff. Such is not the concern in this case since Caldero is clearly identified in the article; however, I believe that based on the position taken by Caldero in his deposition and pleadings, and after a careful reading of the article itself, it cannot be said that the article has defamed Caldero, and therefore the search for actual malice in the publication becomes irrelevant.

I believe that a case directly in point is this Court's recent decision in *Hemingway v. Fritz,* 96 Idaho 364, 529 P.2d 264 (1974). In that case a public official sued a newspaper publisher alleging that a news article and editorial that it had printed about him were libelous. The publication in that case was critical of the official and of certain actions he had taken in office. This Court affirmed the trial court's grant of summary judgment to the defendant, and we observed:

"Critical statements aimed at public officials and their conduct in relation to their public trust should not be microscopically examined. Rather, 'the article must be read and construed as a whole.' [*Gough v. Tribune-Journal Co.,* 75 Idaho 502, 508, 275 P.2d 663 (1954)]. Reading the article and editorial as a whole, we do not feel that Hemingway has been untruthfully accused of a misuse of his public office.

Whatever impropriety he may feel he has been accused of by the use of 'privileged information' in bidding, Hemingway in his deposition in essence admitted the essential facts in the publications . . ." 96 Idaho at 365–366, 529 P.2d at 265–266.

It is important to note that the plaintiff in *Hemingway* also sought discovery of an alleged informant, but this Court stated that since the articles in question were not defamatory, discovery of the informant was irrelevant. 96 Idaho at 366, 529 P.2d 264.

The basic facts surrounding the incident in the Couer d'Alene park, as described in the Tribune article, are not disputed by Caldero. His contention is that he has been harmed by the overall tone of the article which was critical of his handling of the situation. However, as a public official, Caldero cannot attempt to stifle public criticism of his actions by means of a defamation suit. As this Court stated in *Weeks v. M–P Publications, Inc.,* 95 Idaho 634, 516 P.2d 193 (1973):

> "The appellants as public officials in the exercise of their officials duties are not immune from the criticism and censure of public debate. The appellants voluntarily entered the arena of public debate and should not complain over ribald or robust criticism of their public action. Political epithets and hyperbole leveled against the actions of public officials are within the freedom of expression protected by the First Amendment afforded to citizens criticizing the function of their government." 95 Idaho at 639, 516 P.2d at 198.

The "fair comment" doctrine is of common law origin, antedating the *New York Times* rule. Comment or opinion upon the conduct of public officials in their office, critical or otherwise, has long been exempt from liability in defamation actions. Prosser, Law of Torts, 4th ed., § 118, p. 819.

In light of the fact that I believe that the article in question is not defamatory of Caldero, it would serve no purpose to allow discovery of the unidentified police expert, and therefore under the circumstances here, I would reverse the order of the district court holding appellant Shelledy in contempt.